WILLIAM S. RELFE, SUPERINTENDENT, ETC., Appellant, v. COMMERCIAL INSURANCE COMPANY ET AL., Respondents.

January 22, 1878.

1. An insurance company cannot, even with the consent of the stockholders, make a valid voluntary assignment of its property, and thus withdraw itself and its property from the control of the Insurance Department of the State, after it has violated the laws made for the regulation of insurance companies. Such an assignment would be in fraud of those laws. Before suit is brought by the superintendent of the Insurance Department, under the statute, an insurance company whose capital stock is impaired may make itself sound; but while it attempts to do business upon an unsound basis, it is acting in fraud of the law; and while it fails to repair the deficiency, the interests of the policy-holder and the public are, by the law, intrusted to a court of equity under provisions created for the case, and the jurisdiction of the court cannot be ousted at the will of the offender. The State is a party to the proceeding, and a full exposure of frauds, if any exist, is essential to the purposes of the State in enacting the law.

2. The legal results of fraud upon the law cannot be indirectly avoided. Though the law relates only to "insurance companies doing business in this State," a company, having violated and acted in fraud of the law while doing business in this State, cannot avoid its penalties by making an assignment, or by ceasing to take new risks, or by any other subterfuge resorted to for the purpose of evading the provisions of the statute for exposure and punishment.

APPEAL from St. Louis Circuit Court.

*Reversed and remanded.*

R. E. ROMBAUER, for appellant, cited: *Price v. Insurance Co.*, 3 Mo. App. 273; *Attorney-General v. Insurance Co.*, Insurance Agents & Brokers' Review, May, 1877, p. 77; *Bank Commissioners v. Bank*, Harr. (Mich.) 112; *Barnes v. Relton*, 8 Phill. L. 133; *Jackson v. McCullach*, 13 Bank. Reg. 283; *Mayer v. Helman*, 1 Otto, 500; 5 Biss. 499.

ZACH. J. MITCHELL, of counsel for appellant.

GEORGE A. MADILL, THOMAS E. RALSTON, and DAVIS & SMITH, for respondents: The company had a right to make the assignment at the time when made.— 2 Dougl. (Mich.)

530 ; *Schultz* v. *Sutter*, 3 Mo. App. 137 ; *De Ruyler* v. *Trustees, etc.*, 3 Barb. Ch. 119 ; 3 N. Y. 238 ; *Haxton* v. *Bishop*, 3 Wend. 13 ; *McCallie* v. *Watson*, 37 Ga. 611 ; *Warner* v. *Mower*, 11 Vt. 385 ; *Flint* v. *Clinton Co.*, 12 N. H. 431 ; *Dana* v. *Bank*, 5 Watts & S. 223 ; *Hurlburt* v. *Carter*, 21 Barb. 221. The assent of the creditors of the company to the deed of assignment is presumed, the same being made for their benefit. — *Conway, ex parte*, 4 Ark. 360 ; *Brooks* v. *Marbury*, 11 Wheat. 78, 96, 97 ; *Brashear* v. *West*, 7 Pet. 608. The notice given by the superintendent of the Insurance Department on the first day of June, 1877, to the Commercial Insurance Company, to make a special statement of its condition up to that day, did not affect the right of the company to make an assignment for the benefit of creditors. — *The State* v. *Commercial Bank*, 13 Smed. & M. 569. Nor does the nearly approaching dissolution of a corporation, by expiration of its charter, affect its right to make an assignment. — *Buford* v. *Packet Co.*, 3 Mo. App. 159 ; *The People* v. *Mauran*, 5 Denio, 400. The assignment worked a dissolution of the company. — *State Savings Assn.* v. *Kellogg*, 52 Mo. 583 ; *Moore* v. *Whitcomb*, 48 Mo. 543 ; *Slee* v. *Bloom*, 19 Johns. 217. The right of the assignee to wind up the business of the company is greater than that of the plaintiff herein. — *Schultz* v. *Sutter*, 3 Mo. App. 137. Statutes in derogation of the common law and personal rights and privileges are always strictly construed, and no common-law right can be taken away by implication. — Dwar. on Stat. 257 ; *Brown* v. *Barry*, 3 Dall. 367. An affirmative statute does not take away the common law. — *Wetmore* v. *Tracy*, 14 Wend. 250 ; *Candee* v. *Hayward*, 37 N. Y. 653 ; *The People* v. *Bristol Co.*, 23 Wend. 222.

HAYDEN, J., delivered the opinion of the court.

This is a proceeding brought by the appellant, as superintendent of the Insurance Department of Missouri, under

the laws in regard to insurance companies, against the Commercial Insurance Company for violation of those laws. There was a prayer that the company proceeded against be restrained from doing business, because it had become insolvent, and for a receiver, etc. A restraining order was granted under the first petition, filed on June 15, 1877 ; and on June 20 the appellant filed a new petition, in which John G. Priest was also made a defendant, the allegations of which are substantially as follows : That the company was incorporated under the laws of Missouri; and has been since 1855, and was still, engaged in business as a fire insurance company, in Missouri and elsewhere ; that, having good reason to suspect that the affairs of the company were in an unsound condition, the appellant had, on June 1, 1877, demanded of it a special statement, which the company failed and refused to make ; on the contrary, with intent to obstruct the petitioner in the performance of his duties as superintendent, and with intent of preventing the execution of the laws of the State provided for the regulation and winding-up of insurance companies, and in fraud of said act, the company became, and still continues, wholly unable to do so, by abandoning and dispossessing itself of all its books, papers, and other property, and by delivering the same to the defendant John G. Priest under color of a pretended deed of assignment, which deed was executed by the officers of said company under an order of its board of directors, and without the consent of either the policy-holders or stockholders of said company, and which is produced and shown to the court ; that said company, thereupon, on June 13, 1877, through one Joseph Bogy, its then acting president, after demand made of it by plaintiff for permission to examine said books and papers for the purpose of ascertaining the true condition of said company, confessed that its capital stock was so impaired that it was unable to continue its business, and that, therefore, it had dispossessed itself of all its books and property under the pre-

tended deed of assignment; that the Commercial Insurance Company is insolvent, and its condition such as to render its further continuance in business hazardous to the public and to those holding its policies; that, notwithstanding the fact that the pretended deed of assignment mentioned discloses the insolvency of defendant the Commercial Insurance Company, yet the said defendant John G. Priest has taken possession of part of the assets of the company, under said fraudulent and colorable deed of assignment, and threatens, unless restrained by the order of the court, to take possession of all the assets of the corporation, and to hold the same, and to administer the same under and subject to the terms of the aforesaid deed. The prayer asked that the company be restrained from proceeding with its business, from delivering any of its assets to Priest, etc., for the appointment of a receiver, and the dissolution of the company and the winding-up of its affairs under the statute, etc.

The restraining order was so extended as to prohibit Priest from taking charge under the assignment, and separate answers were filed by Priest and the company. That of Priest admits that the capital stock of the company was impaired, and that, so far, the company was insolvent; denies that it was engaged in business when the suit was brought; and alleges that on June 12, 1877, it ceased to do any further new business, and made the assignment, under the assignment law, for the benefit of all its creditors, which was accepted by Priest, and recorded; that the assignment was in good faith, in no way obstructed the appellant, and was assented to and confirmed by the stockholders of the company. It was further admitted that at the time of the assignment the company could not pay its creditors in full, and return to its stockholders the amounts they had paid on their stock. A reply admitted the material allegations alleged in his behalf by the respondent Priest.

The answer of the company admitted that the appellant

demanded the special statement about June 1, 1877 ; that it had never been made ; that the capital stock of the company was impaired ; pleaded the assignment, and that the directors, on June 11, 1877, ordered it as the most economical way of winding up the business of the company ; and alleged that, out of stockholders holding five thousand shares, the representatives of all but three hundred and five shares consented.    To this a reply was filed, putting in issue the material allegations.

Upon the trial, the annual statement of the company for the year ending Dec. 31, 1876, being shown to the late president of the company, from the files of the Insurance Department, the signatures were proved, and it appeared the paper had been sent to the department as the statement of the company.    The respondents then admitted, for the purposes of the trial, that the company was insolvent at the date of the assignment.    With a view of showing that the assignment was not made in good faith, but to cover up fraudulent acts charged in the pleadings, and was in fraud of the insurance laws, the appellant offered to show that a lot of ground sworn in the annual statement to be worth $100,000, and as having cost that sum, was assessed at only $37,500, and had been bought by the company with its own stock, worth then only a nominal sum ; that instead of six hundred and seventy-eight shares of stock in the Exchange Bank, sworn in the statement as being the company's property, it had only six shares ; that the company never had the one hundred and ten first-mortgage bonds of the St. Louis, Kansas City, and Northern Railroad Company shown by the statement, or any other of the good assets shown by the statement, but only various assets which the appellant offered to show were of comparatively little value.    This evidence was objected to under the issues, and excluded. The court below ruled that the question of the power of the company to make the assignment was to be passed upon, but that the court would not then try other issues.    On

July 17, 1877, the court gave judgment sustaining the assignment, dissolved the injunction as to Priest, dismissed the petition as to him, and made the injunction by which the company was restrained from doing business perpetual. The case is here by appeal.

It is contended by the respondents that the Commercial Insurance Company had the right, on the twelfth day of June, 1877, to make a voluntary assignment for the benefit of creditors. Whether the statute in relation to assignments (Wag. Stat. 150) would, in the absence of the insurance laws of this State, cover a case like the present, where, as would appear from the answer of the company, a minority of the stockholders did not assent to the assignment; whether the assignee would have sufficient powers to adjust the rights of all parties in interest; these, and the incidental question what, in such case, would become of the franchise, and what, if any, would be the legal obstacle that would prevent the company from resuming its business after the assignment, do not arise upon the facts of this case. It is sufficient that the Legislature has provided for dissolution here by direct proceeding; that the assignment law has no provisions especially applicable to insurance companies, while the insurance laws have such; that the assignment law does not provide or attempt to provide for infractions of the insurance laws by insurance companies, while sections of the insurance laws were passed especially for that purpose.

That the insurance laws of this State provide, in express terms, for the dissolution of fire insurance companies and for winding up their business, appears from sec. 32 of the act of 1869, relating to insurance companies other than life. Sess. Acts 1869, p. 56; Wag. Stat. 772. This section provides that "it shall be the duty of the superintendent of the Insurance Department, whenever he shall have good reason to suspect that the affairs of any insurance company * * * doing in this State the business mentioned in the first section of this act, are in an unsound con-

dition, to require of said company a special statement of its affairs.'' The section then provides various steps which are to be taken with a view of ascertaining whether the financial condition of the company is sound ; for publication of the results of the investigation, in certain contingencies ; for revocation of the certificate of the company when unsound ; for notice to make up impairment of capital stock, and upon failure, or the company's appearing to be insolvent or in hazardous condition, either to the public or to its policy-holders, for the filing of a petition in the Circuit Court setting forth the facts, and asking that the company may be restrained from further proceeding with its business. A summary proceeding, out of the ordinary course, is then provided for, a speedy hearing directed, and the section then continues : '' One or more referees versed in the business of insurance   *   *   *   may be appointed by the court, or judge, to report upon the condition of said company, or upon any question of fact arising in the cause. The court or judge may, at any time after the filing, appoint agents or receivers to take possession of the property of said company, and may, upon the final hearing, make such orders and decrees as may be needful to suspend, restrain, or prohibit the further continuance of the business of said company, or any part thereof, or for the dissolution of the said company and the winding-up of its affairs.'' This section anticipates the failure of the company to make any defence, and provides that judgment may be taken against it by default, and in this way, as well as by the alternative words just quoted, anticipates the contingency in which the order restraining the company from continuing its business would be merely nominal, and the essential order that dissolving the corporation and winding up its affairs. The propriety, however, in any given case, of a decree of dissolution would depend upon the facts. Full chancery powers are implied by the words of the statute, and the use of the terms '' suspend, restrain, or prohibit the further continuance of the

business of the company, or any part thereof, or for the dissolution of the said company and the winding-up of its affairs,'' shows that such orders and decrees may be made by the court as a court of equity, or the judge as a chancellor, as will meet all exigencies. A case may be supposed where the violation of the law arose from accident, where the capital stock was unimpaired and the company sound within the law, and where only an order for temporary suspension as to its business, or a part of its business, would be necessary or proper; while, on the other hand, the company might be hopelessly insolvent, and have been guilty of repeated frauds upon the law, so that a decree of dissolution would be the only proper action in its case. Sec. 32, when taken in connection with the other provisions of the act, shows that where a company has once brought itself, even temporarily, within the mischief of the act, and proceedings are instituted by the State, through its officers, the whole matter is relegated to the forum of the chancellor, where there are process and full powers adequate to every exigency and to the protection of all interests. It is, moreover, a well-established rule of chancery, that where a court of equity powers once takes jurisdiction of a case, it will proceed with it to its final disposition; and so far is this principle carried, that a court of equity will, in order to dispose of the matter, decide, not only questions of law, but ultimate issues of fact which, of themselves, would be triable by jury.

Upon the assumption of the commission of an offence authorizing the proceeding, and of insolvency, it follows that a company has no right to make an assignment and withdraw itself from the operation of the law. To hold otherwise would be to hold that the effectual means by which the State seeks to enforce a line of public policy may be set at naught by the action of individuals, and the operation of the law substantially evaded. The General Statutes of 1865 show no laws of the character of those now under dis-

cussion. In 1869 these insurance laws were first passed, and since then the Legislature has made repeated amendments which show an intent to perfect the system, and secure, not only the rights of the existing policy-holder, but possible and contingent rights of the non-policy-holding public. Sess. Acts 1869, pp. 22, 26, 45 ; Wag. Stat. 732, 737, 759 ; Sess. Acts 1874, pp. 73, 79. The Legislature has established a separate executive department, and charged its chief officer " with the execution of all laws  *   *   *   in relation to insurance, and insurance companies doing business in this State." To companies which comply with these laws he is to issue certificates of authority to transact business in this State ; while against companies which, within the meaning of the law, are in an unsound condition he is to take legal proceedings. By these laws the companies subject to them are, as was held in *Price* v. *St. Louis Mutual Life Insurance Company*, 3 Mo. App. 262, excluded, in some respects, from the class of ordinary business corporations. The policy of the State has subjected them to restrictions and to a supervision which materially affect their character and powers. In the exercise of its police authority, the State has made regulations which, in some instances, lessen the rights previously possessed by the companies. As it is for the State to say, not only what rights in property need especial protection, but also what means are best adapted to secure that protection, it does not lie with either stockholders or policy-holders, by their consent, to do away with the means selected by the Legislature. For this reason, too, considerations as to the propriety or economy of an assignment are not pertinent. It is for the courts, by interpretation of the acts, according to their spirit and letter, to carry out the legislative intent. To secure a sound system of insurance in the State, a public prosecutor for violations of these laws is selected. If the command of the law is obeyed, the officer has, so far, no duty to perform ; it is only where the law is disobeyed that his

duty begins, and that duty then relates, not merely to the given case, but has a bearing upon all possible cases where the law is liable to infringement. There can be no proper construction of these laws which leaves out of view their exemplary character. The State is a party to the proceeding, and publicity and exposure — a full showing-up of frauds, if there are frauds — are essential to the purposes of the State. It is evident that to the officers of a company, hesitating whether or not to violate these laws, the prospect of a public prosecution of the company would be one thing, the prospect of an assignment a very different thing.

Regarding the question from the point of view of the policy-holder, the same result follows. The words of the statute above quoted, in regard to the decree for dissolution, if they are of any force, apply to companies hopelessly insolvent and guilty of frauds upon the law. But if the law requires such companies to be prosecuted, and prescribes for them this decree, certainly here is a legislative declaration that, after the commission of the guilty acts for which they are prosecuted, the interests of the policy-holders shall not be intrusted to them. But the assignment is the act of the company, and by this act policy-holders and property alike are turned over to the company's assignee. Thus the State, which has said that the policy-holder and the public have, as against innocent companies, no sufficient security without an elaborate system of checks and restrictions and the protection of a public officer, is supposed, under its laws, to commit to a guilty company the disposition of the policy-holder and his interests; and this, while the public prosecutor is seeking to carry into effect the statutory provisions with the execution of which he is charged.

Under the statute, before suit is brought, a company whose capital stock is impaired has its option. It may make itself sound. But while it attempts to do business

upon an unsound basis, it is acting in fraud of the law; and while it fails to repair the deficiency, the interests of the policy-holder and the public are intrusted by the law, not to the offending company and its assignee, but to a court of equity or the chancellor, under provisions created for the case. In the proceeding at bar, it does not appear from any evidence whether the policy-holders assented to the assignment or not. The allegation in the petition that they did not assent is denied by the general denials of the answers. They probably did not assent; but this does not appear, and we do not assume that they dissented. Upon the facts of this case, their assent could not give validity to the assignment. Their non-assent would merely furnish an additional argument not needed in the case. As the law does not require their acquiescence in the proceeding by the State officer, so the jurisdiction of the court cannot be ousted by their assent to an assignment. It is sufficient for the courts that the law-making power has selected its own means to accomplish its purpose; but were it pertinent to inquire into the reasons for such selection, some of them would appear upon the surface. Policy-holders represent almost every class in the community, and almost every degree of intelligence. Policies sometimes form the sole dependence of families; wives and children looking, in case of life-policies, often exclusively to them. In a contest between the policy-holder and a company, perhaps a combination of companies, the rights of the former are liable to be sacrificed. The threat of protracted litigation, always available, is apt to induce the policy-holder to abate his just claims. These and similar considerations may have induced the legislative action. But be this as it may, that action has been taken.

It is urged, indeed, that when a company thus makes an assignment it ceases to do business, and so is not amenable to laws which relate only to "insurance companies doing business in this State." Assuming that the motive of using

these words was other than merely to subject foreign corporations to certain requirements, the question arises, At what time must the company be " doing business?" The assumption is that the company must be doing business when the suit is brought. In the sense in which it is used, this assumption involves a double fallacy. In the first place, it ignores the fact that, under the law, the suit is merely one of the steps to be taken by the superintendent of insurance; and, in the next, it implies that the company which is taking no new risks is doing no business. But, within the purview of the act, the adjustment of the rights of the policy-holders is business, and very important business. Where, indeed, a company had conformed to the law, a different case would be presented. The essential jurisdictional fact is a violation of the act such as warrants prosecution. In this the proceeding has its birth; and then follows the obvious proposition that one who is subject to a law cannot violate its inhibition, and, upon such violation, claim that he is no longer subject to it. A person liable to penalties cannot provoke the law which inflicts them, and then stop and claim he is exempt. This, like the assignment, would be an act of the company's own, done with the intent to evade the law and defeat its purpose; an act, in either case, conclusively presumed to be so done, because that is its natural consequence. But the legal results of frauds upon the law cannot be indirectly avoided. *Dolus circuitu non purgatur.* Either subterfuge would be open to every insolvent company, and the operation of sec. 32 would be at an end.

The questions here involved depend upon the insurance laws of this State, and cases of other States afford little aid. The appellant relies upon the case of *Bank Commissioners* v. *Bank of Brest*, Harr. (Mich.) 106, while the respondents rely on *Town* v. *Bank of River Raisin*, 2 Dougl. (Mich.) 530. Neither case involved any question as to insurance companies, and the rights of policy-holders and proceedings by the State under insurance laws were, of course, not in-

volved. The views of the court in the latter case, so far as they tend to show that an assignment would not operate to dissolve the corporation, but that it might resume business, and that a direct proceeding instituted by the State would be necessary to forfeit its franchise, militate directly against the position of the respondents in this case, and afford another argument to show that an assignment would be against the policy of our insurance laws. Under our law, where the company has failed to avail itself of the opportunity given it to restore the impairment of its capital stock, and is hopelessly insolvent, a dissolution of the company and a winding-up of its affairs are expressly provided for; and the proceeding being by the State, and directly for that purpose, the company's after-existence, and capability of again doing business, would be directly against the provisions of the acts. Yet, upon the views of the court in the case last cited, this might happen under an assignment.

It follows from what has been said that there was error in the action of the court below, by which proceedings were sustained partly under the insurance laws and partly under the Assignment Act. The order of the court prohibiting the company from doing business implied that the appellant had made out his case. Indeed, the company substantially admitted this by its answer, and on the trial. Upon the facts admitted, it followed as a necessary legal consequence that the assignment was void *ab initio*. That the assignment was made before suit brought was immaterial, as at the time of the assignment the company had brought itself within the thirty-second section, and the process prescribed by it. In fact, the first step in the prosecution, the demand of the " special statement," which was never responded to, was taken on June 1, and the assignment was not made until June 11.

The judgment is reversed and the cause remanded, to be proceeded with according to this opinion. All the judges concur.