WILLIAM S. RELFE, SUPERINTENDENT OF INSURANCE, Respondent, *v.* COMMERCIAL INSURANCE COMPANY ET AL., Appellants.

June 7, 1881.

1. The decree in a proceeding by the superintendent of insurance to wind up a company, terminates the contract of insurance, and the surrender-value of the policy is to be computed from that date.

2. Neither an assignment by the company for the benefit of its creditors, nor the institution of proceedings against it by the superintendent, is equivalent to notice of an intention by the company to cancel existing policies.

3. Pending such proceedings, any policy-holder who distinctly indicates his intention of terminating the policy and of claiming the unearned premiums, may have the surrender-value of his policy computed from that date.

APPEAL from the St. Louis Circuit Court, THAYER, J.
*Reversed and remanded.*

GLOVER & SHEPLEY, NOBLE & ORRICK, and DAVIS & SMITH, for the appellants: Suspension and insolvency of a company is no breach of its contracts. — *Ex parte Tondeau*, L. R. 5 Eq. 160; 2 Lindley on Part. 1314; *Clark* v. *Middleton*, 19 Mo. 53; *Starling* v. *Mercantile Ins. Co.*, 32 Pa. St. 175; *Swanscot* v. *Read*, 4 Fost. 428; *Hunley* v. *Belcher*, 30 Barb. 580; *New England* v. *Butler*, 34 Me. 451; *Howe* v. *Folger*, 1 Sandf. 177. Under the English Winding-up Acts the date of the decree, or the date of presentation of the claim after the decree, is the

time for valuing such claims. — Law Journal Stats. (1862, 1864) 207, sect. 158; 2 Lindley on Part. 1304, 1307, 1314; *Craig's Case, In re Albert Ins. Co.*, L. R. 9 Eq. 706, 720. And it is the settled law of this State that these statutes regulating insurance companies are police regulations, and not an infraction of the rule of the Constitution. — *Price* v. *Insurance Co.*, 3 Mo. App. 267; *The State* v. *Matthews*, 44 Mo. 523; *The State* v. *King*, 44 Mo. 283.

J. B. WOODWARD, for the respondent: The creditors claiming unearned premiums were practically without insurance after June 15th, as the company was resting under the disability of an injunction which prevented it from transacting business of any kind, the company having, by an infraction of the State insurance law, incurred forfeiture of its charter and could not make or discharge contracts. — *In re Albert Life Ins. Co.*, 5 Big. 673; *Smith* v. *Insurance Co.*, 2 Coop. Ch. 727. The final decree of dissolution of February 14, 1878, simply establishes the fact that on June 15th the company had committed acts which worked a forfeiture of its charter. It was simply a legal adjudication of such forfeiture, and, therefore, related back to said date. — *Attorney-General* v. *Insurance Co.*, 9 Ins. L. J. 849. The assignment to Priest of June 11th was a confession of insolvency and of its failure to comply with the insurance laws of the State, and was a surrender of its rights. — *Moore* v. *Whitcomb*, 48 Mo. 543. The contracts in law and in equity were, therefore, broken on and prior to June 15, 1877, and the policy-holder had a claim for damages for the breach of his contract on that day. — *Attorney-General* v. *Insurance Co.*, 9 Ins. L. J. 849; *Robertson* v. *Davenport*, 27 Ala. 574.

THOMPSON, J., delivered the opinion of the court.

On the twelfth day of June, 1877, the Commercial Insurance Company of St. Louis, being insolvent, ceased to

do business, and made an assignment to John G. Priest, under the assignment law, for the equal benefit of all its creditors. On the sixteenth day of June, William S. Relfe, superintendent of the insurance department of Missouri, instituted a proceeding under the laws relating to insurance companies, against the assignee, making Priest, the assignee, a party defendant. On the 20th of June a restraining order was issued against, the company and assignee; such proceedings were had that, in obedience to a decision of this court (*Relfe* v. *Insurance Co.*, 5 Mo. App. 173), the Circuit Court, on February 14, 1878, entered a decree perpetuating the restraining order, dissolving the company, appointing a receiver to take charge of its assets, with directions to him to audit claims against the company, to report to the court all claims allowed or disallowed, and providing that parties aggrieved by his action in allowing or disallowing claims might except to the same, and have the same reveiwed by the court. On November 10, 1879, the receiver filed a report, in which he recommended the allowance of a variety of claims, which may be divided into three classes: (1) Claims for unearned premiums on policies in force at the time when proceedings were commenced against the company; (2) claims for fire-losses happening prior to the decree dissolving the company; (3) miscellaneous claims, including claims for services, amounts due agents, etc. The report also passes upon claims for attorneys' fees, and also a claim for a fire-loss which happened since the decree dissolving the company; but as these are not the subject of exceptions, they need not be considered.

In order to produce equality, as far as possible, among the creditors, it became necessary for the receiver to fix upon a date from which the amount due for unearned premiums should be calculated. It also became necessary for him to determine the period beyond which no allowance should be made for losses by fire. He came to the conclu-

sion, evidently as the result of careful consideration, that claims for unearned premiums should be adjusted as of the fifteenth day of June, 1877, the date of the commencement of these proceedings, and that claims for fire losses should be allowed down to the fourteenth day of February, 1878, the date of the decree dissolving the company. The Exchange Bank, the largest creditor of the company, has filed exceptions to this report, and Taffa Bros. and Robert Campbell's estate have joined in these exceptions. The company is debtor to the Exchange Bank for a large amount of money loaned upon notes of the company, discounted by the bank. The company is indebted to Taffa Bros. and to Robert Campbell's estate upon policies for losses by fire which happened prior to the commencement of these proceedings against the company. The importance of these exceptions will be seen from the fact that if the unearned premiums which are to be restored to policy-holders are to be estimated from the fifteenth day of June, 1877, the date of the commencement of these proceedings against the company, there will be distributed the sum of $42,085.18 among 3,206 policy-holders; whereas, if these unearned premiums are to be estimated as of February 14, 1878, the date of the decree dissolving the company, there will be distributed only $9,033.34, among only 1,253 policy-holders, the other policies having in the meantime expired by their respective limitations. The point of the contest consists in the fact that, as there is not enough for all, and as each must take a *pro rata*, the excepting creditors will get a much smaller dividend if the view of the receiver is sustained, than they will under the rule for which they are contending. The exceptors insist that the report of the receiver is inconsistent with itself, in that it holds the contracts of insurance broken on the fifteenth day of June, 1877, for the purpose of estimating unearned premiums, and treats them as continuing contracts down to February 14, 1878, for the purpose of adjusting fire losses.

The receiver at first was of the impression that these were inconsistent positions, but on further consideration he came to the conclusions embodied in his report, and his report was sustained by the court.

The policies of the company contain the following conditions : " This insurance may be terminated at any time, at the request of the assured, in which case the company shall retain only the customary short-rates for the time the policy has been in force. The insurance may also terminate at any time at the option of the company, on giving notice to that effect, and refunding a ratable proportion of the premiums for the unexpired term of the policy."

A statute passed since the date of the decree dissolving the company ( 2 Rev. Stats., sect. 6053 ) provides as follows : " In the settlement of the affairs of insurance companies already dissolved and in the hands of the court by its receivers, the court shall, as far as possible, conform to, and be governed by, the provisions of this law." Another section of the same statute ( 2 Rev. Stats., sect. 6046 ) provides that, " in case of companies other than life, he [the superintendent of insurance] shall ascertain the amount of premium unearned on each policy, outstanding, and in force at the time of the decree dissolving the company, and the amount of losses outstanding at that time."

We fully appreciate the force of the suggestions made by the receiver in his carefully prepared report, that the policy-holders have had no substantial indemnity since the date of the commencement of these proceedings, and that they have been driven, no doubt, in the exercise of ordinary prudence, to effect new insurances in solvent companies ; and we have not reached the conclusion which we now announce, without a good deal of doubt and hesitation. The cases which have been cited to us relating to life insurance companies do do not seem to have much bearing upon the question, because the contract of life insurance is materially different from that of fire insurance. The former is a continuing

contract for the life of the assured, or other period of
indemnity, and has no other relation to the premium than
that which grows out of the fact that it is subject to be
forfeited at the pleasure of the company whenever a stated
premium is not paid; the latter is limited to a period for
which a premium has been paid, and may be determined at
the pleasure of either party within that period.

Nor does the statute to which we have referred have any
bearing upon this case. We have cited it merely to show
that we have not overlooked its provisions. It was passed
subsequently to the time when the rights under considera-
tion became fixed. Those rights rest wholly in contract.
It was not competent for the Legislature to vary them by a
retrospective act. This is too plain for argument.

We have, then, to deal with the question as a general
question of law, and as a question of first impression. We
think, however, that when regard is had to the contract
relation between the parties, the question presents no diffi-
culty. The contract was determinable at pleasure by either
side, — the assured by request, the company by notice. If
terminated by the assured, the company was bound to pay
back the premium it had received, except so much as was
necessary to pay for the insurance which the assured had
received under the policy, at the customary short rates of
the company, by which we understand the rates at which the
company was accustomed to take risks for the length of
time the policy had run at the time it was thus terminated.
If terminated by the company, the company was bound to
pay back a ratable proportion of the premium it had
received, represented by the unexpired term of the policy.
But it could not be terminated by the company except on
condition of thus restoring the unearned portion of the
premium.

It seems impossible to hold that the act of the company
in making an assignment for the benefit of its creditors was
equivalent to an election on its part to cancel all its existing

policies, and to a notification to its policy-holders of that fact. It is true that, by making the assignment to Priest, it confessed its inability to go on with its business. The assignment simply meant that, in the judgment of those controlling the affairs of the company, it was impossible or inexpedient for it to continue to take new business. It was not in any sense a notification to its policy-holders that their policies from that date were cancelled. It could not have been, for it was not competent to the company to cancel its policies except in pursuance of the terms of the policies themselves, — that is, by paying or tendering back the unearned premiums. This it neither did nor attempted to do ; and there is no suggestion in the record that the deed of assignment to Priest authorized or required him to do this, or that he did it or attempted to do it. So far as the company acted involuntarily, its action simply presented the case of a corporation going into liquidation. It may have been, so far as was seen then, by reason of insolvency ; it may have been merely because a majority of its stockholders deemed it unadvisable or unprofitable to continue business. Nor is it possible to construe the proceeding instituted by Relfe, as superintendent of insurance, as having this effect. It established nothing until it resulted in the decree dissolving the company. During all this time — the time which intervened between the commencement of this proceeding and the decree — the company was under injunction, — sealed up, so to speak ; prevented from doing business : how far sealed up, how far restricted in its action, depended upon the terms of the injunction, which are not shown by this record. Let it be assumed it could do nothing, — that it was frozen up during that period of time like a piece of ice, — and what were the respective rights of the parties? Certainly there was nothing to prevent policy-holders from demanding a cancellation of their policies, and the repayment of their unearned premiums. Of course the demand would not have been followed by the immediate

payment ; but, nevertheless, it would have been a good legal demand, and would have established the rights of policy-holders as creditors of the company to the extent of such unearned premiums. It would have been just like the case of a note of the company going to protest during that period. The injunction would have restrained the directors from paying the note, but this fact would not have excluded the holder from making a demand of payment upon them in order to charge an indorser.

It results that, in our view, neither the assignment to Priest, nor the commencement of proceedings by Relfe, *ipso facto*, impaired the contracts of the company with its policy-holders. After the commencement of proceedings by Relfe, it was not competent for the company, by its own act, to cancel or determine any policy ; and all policies in force at that time are to be treated as continuing in force until the decree of dissolution, unless the respective policy-holders themselves did some act indicating a distinct intention to terminate them and to claim the unearned premiums. In such cases the unearned premiums are to be computed from the date when the respective policy-holders thus expressed their election to terminate the contract. In all other cases where the policies were not determined before the commencement of the proceeding by Relfe, the date of the decree dissolving the company (namely, February 15, 1878) will be taken as the date from which the surrender-value of the policies is to be computed. On the date when each policy became determined according to these rules, the policy-holder became a creditor of the company to the extent of the surrender-value of the policy. It will thus turn out, no doubt, that the demands of different policy-holders and creditors became payable at different times ; equality will be produced among them by allowing them interest upon their respective demands from the date when they respectively accrued until the date when the first dividend is struck.

It results that, in the judgment of the court, the conclusions of the receiver were erroneous, and that the court erred in confirming his report against the objection of the exceptors. The judgment upon the receiver's report is reversed and the cause remanded, with directions to take further proceedings in conformity with this opinion. All the judges concur.