LAZELLE E. ALEXANDER, RECEIVER, Plaintiff in Error, v. JOHN F. WILLIAMS, SUPERINTENDENT, Defendant in Error.

May 15, 1388.

1. EQUITY—FRAUDS—VOID CONTRACT—INSURANCE LAWS—RESCISSION.—. The Columbia Insurance Company and the Life Association being rival companies, the Columbia being embarrassed and harassed by law suits, the Life Association, which owned the majority of the stock of the Columbia, caused the Columbia directory to be wholly composed of directors of the Life Association, and then, by an agreement between the two companies, the Life Association began substituting with the consent of the policy-holders of the Columbia, policies in the Life Association for policies in the Columbia, and assets of the Columbia were transferred to the Life Association for the reserve value of the policies of which the Columbia was thus relieved, and which the Life Association assumed. When this work had progressed to a point at which the Life Association had thus relieved the Columbia of about three thousand policies, the reserve value of which was about $700,000, representing an insurance of seven millions, and assets of the nominal value of $555,000 had been transferred from the Columbia to the Life Association, the Columbia was put into liquidation and a receiver appointed under the insurance laws. Afterwards, the Life Association was put into liquidation. The receiver of the Columbia began this action to avoid the contract between the companies and to recover back the assets transferred.

The circuit court, on hearing, dismissed the bill. It is held that this action of the circuit court was warranted by the facts appearing on the trial. The contract between the companies was not necessarily void merely because the directors were the same in both.

2. ——. A transaction made in good faith, whereby an insurance corporation not alleged to be insolvent, having a controlling interest in another corporation, after the demand of a special statement from the latter by the superintendent of insurance, delays that statement, and without removing the assets of either corporation from the reach of the superintendent of insurance, proceeds to reinsure the risks of the second company, absorbing its assets *pro rata* as it assumes its burdens, is not necessarily void as in fraud of the insurance law or as against public policy.

3. ——. It not having appeared that there was any intention to hinder, delay, or defraud the creditors of the Columbia; or that the insolvency of either company was brought about by the transaction, or that the creditors of the Columbia were injured by the transaction, or would have been injured had it been completed; or that the assets transferred for the liabilities assumed were out of proportion to the assets left for the liabilities remaining; or that the contract was oppressive or unfair to the Columbia, or to her creditors or stockholders; the fact that the Columbia's receiver, in the course of subsequent litigation, established a claim against the Life Association of a million dollars for another transaction, as to which, at the time it was made, neither corporation recognized any liability, cannot, by an *ex post facto* operation, be held to show intent to defraud the creditors of the Columbia in the transfer of assets.

ERROR to the St. Louis Circuit Court, THAYER, J. *Affirmed.*

JOHN D. POPE, for the plaintiff in error : Where bankrupt laws are in force, the public policy of the government is embodied in the provisions therein made for the surrender and distribution of the assets of insolvents ; and every contract and device intended to defeat the full and free operation of these provisions is illegal as against public policy. — *Nerot* v. *Wallace*, 3 Term Rep. 17 ; *Bell* v. *Liggett*, 7 N. Y. 176 ; *Downs* v. *Lewis*, 11 Cush. 78 ; *Dexter* v. *Snow*, 12 Cush. 594 ; *Austin* v. *Markham*, 44 Ga. 161 ; *York* v. *Merrett*, 77 N. C. 215 ; *Claftin* v. *Torlina*, 56 Mo. 369 ; *Louthan* v. *Stillwell*, 73 Mo. 493. The same is held as to agreements not to plead the statute of limita-

tions, or the usury laws, contracts to pay for obtaining signatures to petitions intended to influence the action of a town council, and stipulations in policies of insurance that suits shall be brought only in the state where the charter of the company was granted. — *Crane* v. *French*, 38 Miss. 503; *Clark* v. *Spencer*, 14 Kan. 398; *Maguire* v. *Smock*, 42 Ind. 1; *Reichard* v. *Manhattan Life Ins. Co.*, 31 Mo. 518. The insurance laws of this state in force at the time the transfers in question were made, contain (as does the new act) plenary provisions for the dissolution of insolvent insurance companies, and the surrender and distribution of their assets. They are, therefore, in the largest sense of the term, bankrupt laws for insurance companies, and express unmistakably the policy of the state respecting their dissolution and the disposition of their assets when they have become insolvent, or the further prosecution of their business has become " hazardous to the public, or to those holding their policies. — Wag. Stats. 753, sect. 41; Rev. Stats. 1879, sects. 6037 *et seq.* Accordingly, it has always been held that contracts and conveyances made in violation of these laws, or designed to evade their provisions, or to thwart proceedings of the superintendent of insurance either begun or contemplated under them, are illegal. — *Alexander* v. *Relfe*, 74 Mo. 518, 519; *Price* v. *St. Louis Mutual Life Ins. Co.*, 3 Mo. App. 273; *Relfe* v. *Commercial Ins. Co.*, 5 Mo. App. 173. Every contract entered into between two corporations by means of resolutions or orders adopted by the same persons acting as directors of both corporations, is voidable at the election of either, or of the legal successor of either, and this, without allegation or proof of bad faith or damage. — *Mercantile Mutual Ins. Co.* v. *Hope Ins. Co.*, 8 Mo. App. 408; *Davoe* v. *Fanning*, 2 Johns. Ch. 251; *Drury* v. *Cross*, 7 Wall. 299; *Koehler* v. *R. R. F. Iron Co.*, 2 Black, 715; *Jackson* v. *Ludeling*, 21 Wall. 616; *Wardell* v. *Railroad*

Co., 103 U. S. 651; Twin-Lick Oil Co. v. Marbury, 91
U. S. 587; Grumley v. Webb, 44 Mo. 451; Thornton v.
Irwin, 43 Mo. 153; Gaines v. Allen, 58 Mo. 537; St.
Louis v. Alexander, 23 Mo. 483; Lingle v. National Ins.
Co., 45 Mo. 109; McAllen v. Woodcock, 60 Mo. 180;
Kitchen v. Railway Co., 69 Mo. 224; Chouteau v. Allen,
70 Mo. 338.   But the transfers in question could not be
upheld even if it were conceded that the insurance law and
the fact that the identity of directors had no weight,
because if the directors had the right to wind up the com-
pany, it being insolvent at the time, all the assets became
a trust-fund for creditors.   The equitable lien of creditors
upon the corporate assets, is for the benefit of all the cred
itors equally. — Price v. St. Louis Mutual Ins. Co., 3 Mo.
App. 262; Relfe v. Commercial Ins. Co., 5 Mo. App. 173,
185; Curran v. Arkansas, 15 How. 304; Sawyer v. Hoag,
17 Wall. 610; Bump's Fr. Conv. (2d ed.) 189; Drury v.
Cross, 7 Wall. 303; Henderson v. Henderson, 55 Mo. 555;
Ames v. Gilmore, 59 Mo. 543.

HORATIO M. JONES, for the defendant in error: There
must be some "covering up," some "giving the debtor a
secret interest," or some "locking up for the debtor's own
use and benefit," to avoid the transaction.   All the cases
sustain this view.   The case of Henderson v. Henderson
(55 Mo. 536) was one of a transaction merely colorable.
It was not a case of a preference at all. — See Ensworth v.
King, 55 Mo. 477; Simpson v. Dall, 3 Wall. 461; Cham-
berlain v. Billsbury, 35 Vt. 16; Darrill v. Terry, 6 Hurl.
& N. 807; Hale v. Saloon Omnibus Co., 4 Drew. 492;
Alton v. Harrison, 38 L. J. (Ch.) 669; Sutton v. Bath,
1 Fost. & Fin. 152; Holbird v. Anderson, 5 Term Rep.
235; 2 Moo. & R. 439; 7 Q. B. 892; Prior v. Kenney,
6 Munf. 610; Clark v. Douglass, 62 Penn. 408; Sewall
v. Russell, 2 Paige, 175; Weir v. Hale, 3 Watts & S.
285; Bailey v. Barton, 8 Wend. 339; Mitchell v. Beal, 8

Yerg. 134; *Barrett* v. *Union Bank*, 5 Humph. 612; *Drury* v. *Cross*, 7 Wall. 299; *Michael* v. *Gay*, 1 Fost. & Fin. 409.

W. S. RELFE, for the defendant in error: One who seeks to avoid or rescind a contract "must put the other party in the condition that he would have been in had the contract not been made," and if this cannot be substantially done, there can be no rescission. — *Jarrett* v. *Morton*, 44 Mo. 277; *Woods* v. *Straup*, 63 Mo. 438; *Moyer* v. *Shoemaker*, 5 Barb. 319; *Wheaton* v. *Baker*, 14 Barb. 594; *Matteawan Co.* v. *Bentley*, 13 Barb. 641.

BAKEWELL, J., delivered the opinion of the court.

The second amended petition in this case, after setting forth that the Columbia Life Insurance Company was a dissolved corporation of which plaintiff is the receiver, and that defendant, as superintendent of the insurance department of Missouri, has charge of all the assets of the Life Association of America in liquidation, that corporation being also dissolved, proceeds to make allegations of transactions between the two corporations during their existence, and of certain transfers of property from the Columbia to the Life Association, and concludes with a prayer that these transfers be declared fraudulent and void; that the title to the property in question, and to the proceeds, be vested in plaintiff, and for an account and a delivery of possession to plaintiff.

The list of personalty and real estate transferred is very long. It consists of real estate alleged to be worth $311,-376.84, and real estate loans, bills receivable, accrued interest, premium loans, and deferred premiums, set out as worth, together, $364,367.54, making a total of property, real and personal, worth $675,744.38.

In the petition as originally filed, there were allegations showing that these transfers were called in question by plaintiff on three grounds: 1. Because they were made

between the companies by officers and, directors incapable of making any agreements for a transfer between the companies, for the reason that the directors of the Columbia, at the time, were, all of them, directors of the Life Association; 2. Because these transfers were made with the intent of defeating the state laws as to insolvent insurance companies, and specially to thwart proceedings already begun by the superintendent of insurance to put the Columbia in liquidation; 3. Because these transfers were made with intent to hinder, delay, and defraud the creditors of the Columbia, and were therefore void under the statute.

On motion of defendant, allegations of the petition as to the intent to defeat the operation of the insurance laws of the state, to evade their provision, and thwart proceedings begun or contemplated by the superintendent of insurance, were stricken out from the petition. Other parts of the petition were also stricken out; but as evidence as to these other allegations was freely introduced on the trial, the action of the court in striking out these last-named allegations is not made a subject of complaint here.

The answer specifically admits many allegations of the petition, and denies others. To give the substantial allegations, admissions, and denials in the pleadings, is impracticable, owing to their length. The answer in conclusion, pleads as an estoppel that plaintiff recovered a judgment for over a million dollars against the Life Association, which was declared a lien upon all its real estate in the city and county of St. Louis; that some of the real estate described in the petition was subject to this lien; that a number of pieces included in the transfers to the Columbia were sold, and the proceeds, by order of the court, paid over to plaintiff, who received the same. The answer also sets up a counter-claim for $700,000, on account of excess of aggregate reserves on policies surrendered to the Columbia over the values received therefor

from the Columbia by the Life Association. There was a general denial to all the new matter in the answer.

On hearing, the issues were found in favor of defendant, and the bill was dismissed.

This action was begun on December 27, 1877, against the Life Association of America. On December, 1, 1879, the dissolution of defendant was suggested, and the superintendent of the insurance department was afterwards substituted as defendant.

It appears that the Mound City Life Insurance Company had been doing a large business in life insurance before February, 1874. At that date, it changed its name to the " St. Louis Life Insurance Company," which, in January, 1876, changed its name to the " Columbia Life Insurance Company." The company remained the same. The Mound City, in January, 1874, reinsured the risks and assumed the obligations of the St. Louis Mutual and of the Missouri Mutual, two life insurance companies. In February, 1874, the Mound City reinsured some risks of the DeSoto Mutual Life Insurance Company. The St. Louis Mutual had reinsured the risks of the Atlas Mutual before its own risks had been insured by the Mound City.

For a period before any of these dates, the Life Association of America and the Columbia, under its various names, had been conducting a life insurance business, on a large scale, their policies extending over the United States; their chief offices being at St. Louis.

On February 22, 1877, the insurance superintendent began formal proceedings against the Columbia to put it in liquidation. In August, 1877, the Columbia was put into the hands of a receiver : and, in October, 1877, there was a final decree of dissolution against that company. The Life Association continued in active business until October, 1879, when proceedings were begun against it by the superintendent of insurance, which resulted in a decree of dissolution, on November 10, 1879.

In 1875, the Life Association and Columbia Life, being rival insurance companies, having a large business extending through the same territory, the managers of the Life Association, thinking that a purchase of a controlling interest in the Columbia would be for the benefit of the Life Association, purchased a large majority of the stock of the Columbia, so as to obtain a controlling vote in that company. The charter of the Life Association required fifteen directors, each of whom must be insured in that association for at least $10,000. It was a mutual, and not a stock, company. The Columbia was a stock company, with eleven directors, by its charter, each of whom must own ten shares of its stock. Portions of the stock of the Columbia were transferred by the Life Association to certain of the directors of the latter association, who were then elected directors of the Columbia, thus entirely replacing the old board. All the directors of the Life Association were not directors of the Columbia, but all the eleven directors of the Columbia were directors of the Life Association. When this was effected, negotiations for consolidating the two insurance companies began.

On October 11, 1876, at a special meeting of directors of the Columbia, the president stated that, on account of the excessive mortality in the company, especially among policy-holders of the St. Louis Mutual Life, and the manner in which the Columbia was persecuted by law suits, and to preserve the interests of the policy-holders, the board was convened to consider the propriety of authorizing the executive committee to take action towards the transfer, with the assent of the assured, of each policy of the Columbia to the Life Association, that the business might be consolidated, and the expense of separate management saved. After a report from the actuary, and a discussion as to the mode of effecting these transfers, and the time required, the executive committee was by resolution authorized to receive from the Life Association the surrender of

all policies issued by the Columbia, St. Louis Life, Mound City Mutual, Mound City Life, St. Louis Mutual, and Atlas Mutual, which may be assigned to the Life Association; the Columbia to pay to the Life Association, for the surrender of such policies, their value, based upon a valuation made on the American table of mortality, with six per cent interest, and any further sum that the company's sworn statement for the year ending December 31, 1876, to the insurance department, may show to belong to such policies respectively; payments to be made with assets of the Columbia, real and personal, and the president and secretary to execute the necessary deeds.

On December 30, 1876, at a meeting of directors of the Life Association, six of these directors being part of the nine directors at the preceding meeting of the Columbia, it was stated by the president that a number of persons holding policies in the Columbia and other companies named in the proceedings of the last meeting, had assigned their policies in exchange for policies in the Life Association; that he had furnished a list of these to the Columbia, requesting that arrangements be made for their purchase, and had received a copy of the resolution set forth above. It was then resolved that the insurance committee of the Life Association be authorized to surrender to the Columbia all policies issued by that company and the other companies named above, which had been assigned to the Life Association, and for which it had agreed to issue policies, on payments to the Life Association, by the Columbia, of the reserve, according to the terms of the resolution set out above.

On December 28, 1876, at a meeting of the directors of the Columbia Life, the president was empowered to execute deeds for certain parcels of real estate, valued on the books of the company at $117,350, and to transfer certain notes secured by real estate, of the full value of $225,367.65, and certain bills receivable amounting to $2,438, in payment on

account, for surrender of two thousand, one hundred and eighty-seven policies, under the arrangement between the companies.

This was the chief transfer of assets and surrender of policies ; but similar transfers and surrenders were authorized and made on January 22, February 16, and February 21, 1877. The total charged to the Life Association by the Columbia for transferred assets was $554,762 ; of which $305,876 was for real estate, the balance for personalty. The total number of policies surrendered, was nearly three thousand ; of the net value of about $700,000 ; of which value about $300,000 was paid-up policies. The amount of insurance for which the Life Association thus became responsible, was over seven millions ; the immediate liability, at the purchasing value of the policies, being about one-tenth of this.

It was admitted at the trial that the amounts insured by the policies given by the Life Association in exchange for the policies of the Columbia and the other companies for which the Columbia was responsible, were about the same amount as those insured by the surrendered policies.

Before the matter was ripe for action of the boards of directors upon the transfer of assets and exchange and surrender of policies, each policy-holder had to be seen, the condition of each policy had to be examined, and the consent of the policy-holder to be obtained in each case, calculations to be made, and policies to be written, all which was a work of time. The policies were classed by localities, and the policies valued. This was done under the supervision of Smith, an actuary in the employ of the Columbia. Smith is a witness for defendant, and he states that the matter of the transfer was begun in October, and went on during about four months. No selections as to individuals were made at any time ; the policies were taken up in groups according to localities, so as to suit the convenience of the

agents. No medical or other examination was required, and no distinction was made as to state of health. The instructions to the actuary were, that the risk and assets to be transferred were to be proportionate, each to each; and, on each transfer, the Life Association was to be credited with the valuation of the policy by the American tables with interest at six per cent; the surplus was to be adjusted in final settlement between the companies, which was never had.

The deposition of Williams, employed by the Life Association to solicit these assignments of policies was read on behalf of plaintiff. He corroborated Smith as to there being no discrimination as to bad risks and no new medical examination. He says that the Life Association recognized the full value of policies exchanged; if the policy was premium-paying, the exchange was even; if paid up, a six per cent reserve was allowed. The policy-holder was placed in the Life Association on the same footing that he had in the Columbia. If the insured had paid premiums to the Columbia for six years, the new policy was dated on the day it was issued, but was accompanied by a paper showing the transaction, and that it was to stand in all respects as to forfeiture and commutation as a policy of six years' standing. This witness further states that no difference was made as to terms from the locality of the insured and the comparative sanitary state of the place of their residence, as being north or south. Plaintiff introduced a letter from Dunlap, president of the Columbia, to Williams, in which he speaks of the litigation against the St. Louis Mutual, and the duty of the Columbia to defend these actions, and goes on to say, that, in view of the difficulties arising from the old business of the St. Louis, Atlas, and Missouri Mutual, it has been determined to give all policy-holders an opportunity of surrendering their policies in exchange for new policies in the Life Association; that, within certain geographical limits (which are not defined), policies in all the companies, except St. Louis and Atlas, would receive new

insurance for the same amount; that the death losses under St. Louis and Atlas policies have been so far above the death rate, that an equal amount of insurance could not be granted in exchange for their policies, but an amount as large as safe would be offered; that nothing can be done in the matter without the consent of the policy-holder; and that the writer thinks the proposition one that they would do well to accept. There were also letters introduced from agents employed in effecting this reinsurance, tending to show a desire to discriminate against the policies of the St. Louis Mutual, and where the death rate had been found excessive. But it is not shown that such discrimination was made. It is suggested in argument that these letters were written to create an impression that might allay apprehensions of imprudent action on the part of the Life Association. Williams, in a letter to a policy-holder in Little Rock, writes that "all desirable business" to the Columbia Life and other companies is being transferred to the Life Association, and that this ought to be to the advantage of the latter company. McBeth who was agent of the Life Association for effecting these reinsurances, writes in January, 1877, to a person in Selma, Alabama, that the Life Association will grant policies in exchange as per tables sent, and says: —" If you can succeed in having any of these parties take new insurance the company will pay a cash commission of fifteen per cent on premiums of new policy." But we see no evidence that any such commission was paid to agents effecting the changes made. No St. Louis Mutual death losses were paid after December 1, 1877. Among the assets of the books of the Columbia were some nearly worthless; a furniture account of $50,000, worth perhaps $5,000, claims against defaulting agents and others, nearly $170,000 perhaps worth nothing. These were not amongst the assets transferred to the Life Association in exchange for policies. The St. Louis Life building was valued on the books of the Columbia at $1,000,000. It was mortgaged for $400,000. It was

sold under the mortgage at $280,000. Real estate experts place its value at from $400,000 to $600,000; this remained amongst the transferred assets of the Columbia, and it is contended that, whilst a six per cent reserve was taken by the Life Association for the policies surrendered, the assets left would not have furnished six per cent reserve on all the policies had the business of reinsurance been completed, that there was not a six per cent reserve left for the policies which the Life Association did not acquire.

It is manifest, however, from the testimony, that the assets taken by the Life Association for the transfers made were not worth their face value, nor the sums at which they were rated on the books of the Columbia, nor the sums at which they were charged to the Life Association. It is impossible to go into details of the testimony as to this. Putting out of sight, however, the question of the lien upon most of this property, subsequently established against the Life Association in favor of the Columbia, it seems probable that the assets, real and personal, transferred at a nominal value of half a million dollars, were not worth more than half that amount, and it is not clear that the remaining assets did not bear the same proportion to the value of the untransferred policies. The building remained. It was unwieldy property to deal with or to dispose of. But though it actually sold at a forced sale for cash at $280,000, it was worth twice that sum according to the estimate of real estate men. The Columbia was insolvent after these transfers were made, as she was before; but, on February 28, 1877, when she ceased to do business, her policy liability was about $3,700,000, and her total liability about four millions, and her assets as shown by her books, were nearly three millions and a half, of which the real estate and real estate loans make up nearly a million, and the remaining $2,500,000 of premium loans, collateral loans, stocks, and bonds, were probably not worth any large percentage of their face value. But if these assets represented only forty per cent of the remaining policy liability of the Columbia, the assets transferred to the Life

Association do not seem to have been worth more than forty per cent of the liability which it assumed.

The result of these transfers of assets and surrenders of policies was, that, in February, 1877, when the superintendent of insurance began proceedings in court to put the Columbia into liquidation, the Life Association had taken up and surrendered to the Columbia nearly three thousand policies, representing over seven millions of insurance, the surrender value of these policies being over $700,000, in consideration of which the Life Association had received from the Columbia assets of the nominal value of less than $700,-000, and of a real value of less than half that sum. The Life Association was then in good credit and standing, and the Columbia was insolvent, though its insolvency was not brought about by these transactions. ·

The Columbia, however, through her receiver, established a claim against the Life Association for over a million of dollars, on account of an alleged conspiracy of certain officers of the Life Association, by which it was said, that a certain draft for $900,000 was yielded up to the Life Association, in exchange for shares of the capital stock of the Columbia.   This claim was first set up by the receiver. Judgment in favor of the receiver of the Columbia was rendered in the circuit court of St. Louis, on October 13, 1879.   On appeal, this judgment was reversed by this court, on the ground of want of capacity in the receiver to sue, and on the further ground that no unlawful act was alleged or shown.   This judgment of reversal was reversed by the supreme court, which, however, required plaintiff to enter a *remittitur* of $130,000 for the value of Columbia stock received.   The judgment being thus reinstated of its original date, the receiver of the Columbia moved the circuit court to declare this a lien on all the real estate owned by the Life Association in Missouri at the original date of the judgment.   This was in 1882, when the Life Association was also in liquidation, and the present

defendant had charge of its assets. The real estate in question was mainly that acquired of the Columbia in the transactions above set out. The superintendent of insurance had reported to the circuit court the sale of almost all this real estate, as well as the amounts realized from the other assets transferred to the Life Association by the Columbia. The circuit court sustained the motion so far as a lien was claimed upon real estate in the city and county of St. Louis; and, it appearing that the superintendent had $72,350, proceeds of the sale of such real estate on hand as assets of the Life Association, he was ordered to pay this and two notes for $1,712 for deferred payments for such sales, to the receiver of the Columbia, which was done, and credited upon the judgment.

It may be observed that counsel for appellant, during the trial, conceded that the directory of both companies acted in good faith in the matter of this scheme for reinsurance and transfer of assets, and that there was no actual fraud in the matter. It is a well-settled principle that one person cannot act in a trade in two positions which impose different obligations which would raise a conflict between interest and duty. Directors of corporations and all persons acting in a fiduciary capacity are subject to this rule. It would follow that the same persons ought not act as agents of different companies in their mutual transactions where the interest of the several companies would be opposed, and it would be the duty of the agents of each company to favor it at the expense of the others. Nevertheless we have found no case where it has been held that a transaction between two corporations is void merely because all the directors of one corporation were also directors of the other. On the other hand, it has been held that a contract of a corporation is not rendered void by the fact that some of the persons assisting to make the contract, and taking part in the performance of conditions, and in acceptance of performance, were officers in both corpora-

tions and represented both to the extent of their respective powers. And where the mayor of a city was also president of a railroad corporation, and the mayor and corporation had passed an ordinance authorizing the mayor to subscribe four hundred shares of stock in the railroad and to issue bonds for the payment of the same, and the mayor submitted the question of subscription to the voters, the subscriptions and bonds were held to be valid. *Mayor* v. *Inmann*, 57 Ga. 370. We cannot see that the fact that there were no directors of the Columbia not also directors of the Life Association, materially changed the principle involved, or makes the case worse for the contract than if there had been some directors of each corporation who were not directors of both.

The directors who did contract with each other would not be more competent to contract for having some co-directors not interested in the other company. The contract between the North Missouri Railroad Company and the St. Louis and North Missouri Company was not held void by the supreme court, though the St. Louis and North Missouri Company was formed to purchase the road by obtaining control of the railroad company, and the association named the majority of the directors of the railroad company. *Kitchen* v. *St. Louis, etc., Ry. Co.*, 69 Mo. 224.

In fact we know that during the litigation which has grown out of these insurance matters in the last few years, contracts between the Columbia and the Life Association, made between directors common to both, have been considered by this court, and by the supreme court, and the capacity to contract has been taken for granted by the courts and never called in question, but assumed by the learned counsel who now represents the plaintiff. *Alexander* v. *Relfe*, 9 Mo. App. 133. And, in the petition in this cause, whilst setting up this identity of directors, the pleader asserts that a contract was made, which he seeks to avoid for fraud. The contract was, in effect, a series of successive steps towards

the consolidation of the two companies ; it was being effected, as the consent of policy-holders could be obtained and new policies written, by taking which the policy-holders would give up their equitable lien on the assets of the company with which they had first contracted, and look to the company to which their assets were being gradually and *pro rata* transferred.   No injustice was done to either corporation, or to creditors, so long as a due proportion was observed between the assets transferred and the liabilities cancelled by one company, and assumed by the other.   Nor does the transaction between the companies appear to us to be necessarily void as in fraud of the state laws in regard to insurance and the public policy of the state as indicated by these laws.   In *Relfe* v. *Commercial Insurance Company* (5 Mo. App. 173), the attempt was by an insolvent insurance company admitting its insolvency, to assign all its assets, and, by this means, to evade the process of winding up insolvent insurance companies provided, by the statute, and to withdraw the assets of the company from administration by the officers whose duty it was by law to investigate its affairs and control the liquidation. This, we held, could not be done.   But the case is different where a corporation, not alleged to be insolvent, having the controlling interest, through ownership of its stock, of another corporation, after the demand of a special statement from the latter corporation by the superintendent of insurance, delays the delivery of that statement, and without removing the assets of either corporation from the reach of the superintendent of insurance proceeds to reinsure the risks of the second company, absorbing its assets *pro rata* as the burdens of the second company are by degrees shifted to the shoulders of the first.   It was not alleged in the present case that this process created insolvency in either of the corporations.

Nor do we see any satisfactory evidence of any intention to defraud, delay, or hinder the creditors of the Columbia for which the transaction should be set aside.   Had the

scheme been carried out as intended, so far as we can see from the evidence, there would probably have been no policy-holders of the Columbia and few creditors, by the time the assets had been completely transferred ; nor does it appear that the execution of the scheme would have injured any one who had a claim against the Columbia.

But it is contended that, if the agreement between the companies was not void, it ought to be set aside if it appears that one corporation exercised an undue influence over the other, or an improper control, or that the contract was oppressive, unequal, or unfair as between the corporations, or to creditors, or stockholders of either ; and in this connection it is insisted that the Life Association, at the time of the agreement, really owed the Columbia $900,000, for which the receiver of the Columbia afterwards established its claim. Neither corporation seems to have recognized any such indebtedness, which arose from a transaction in which there was a purchase of assets with a draft on the Life Association accepted by it, a substitution of drafts, and, at last, the change of a draft for nominal equivalent of stock in the Columbia, all which took place two years before the transactions now in consideration. The claim set up by the receiver, and successfully resisted in this court, can hardly, by an *ex post facto* operation, be held to show a fraudulent intent as to the creditors of the Columbia in the transfer of assets now under consideration. The evidence tends to show that, in receiving these assets, the Life Association relieved the Columbia and helped its creditors, and that was the intention of the directors ; that the burden assumed by the Life Association was largely in excess of the assets received by it, and that the burden which the Life Association assumed was lifted from the Columbia.

But, in any view that may be taken of the evidence, or the law as to void and voidable conveyances, fraudulent assignments, and the powers and duties of directors and agents of the corporations, we do not see that this is a case

for equitable interference, or that a court of equity can give any relief.

So far as the real estate is concerned, it appears that the receiver of the Columbia has almost all of it already, under his judgment, and that, at the time that this case was ripe for a decree of the circuit court, the defendant had no title to the greater part of the assets which plaintiff claims ; that the title and possession were already in the plaintiff. It appears that the total net proceeds of the assets received from the Columbia which had come into the hands of the superintendent of insurance, on January 30, 1882, was $105,403. The Thornton real estate has already been adjudged to plaintiff under his lien. It does not appear that there is much more to be made by the superintendent out of the property transferred. A rescission would leave about $45,000 to be turned over by defendant to plaintiff, and plaintiff would be entitled to a general judgment, in addition, for the remaining assets, valued on the books of the Columbia at about $300,000 ; and, if we are to be guided as to their real value by the amount realized upon the other transferred assets, not worth probably half that sum. But the Life Association has put itself into the shoes of the Columbia for a liability of about $700,000 — the reserve value of the Columbia policies which the Life Association has taken up and surrendered to the Columbia. The Columbia does not deny that these were outstanding liabilities of hers which the Life Association bought up. The Columbia is not to get back her assets, and remain discharged of the liability which those assets were intended to secure. If she gets back her assets, she should pay the obligation which the Life Association assumed in consideration of these assets. Then there ought to be a general judgment in favor of the Life Association for some $700,000 — certainly for more than enough to swallow up any special and general judgments in favor of the Columbia. This sum defendant's counsel admits that the Life Association is entitled to, but

he says it should be allowed against the receiver of the Columbia, as any ordinary policy claim to be paid *pro rata* with other policy claims. This certainly would not put the parties in the condition in which they would have been, had no contract been made. The Life Association has assumed $700,000 of liability of the Columbia, besides paying out cash for death losses; this liability it still has, and from this liability the Columbia is relieved. All the consideration received for assuming this liability is to be surrendered, and though the Columbia, in liquidation, has never paid a dividend, the Life Association is to take its chances of a general dividend to repay it for assuming the entire policy liability of the Columbia.

So far as we are able to see from this large record, and from the arguments and briefs of counsel, the Life Association, in these transfers and this reinsurance, made a bargain burdensome to it and beneficial to the Columbia. It does not satisfactorily appear that the arrangement was made with intent to hinder, delay, or defraud creditors of the Columbia, or that it must have, or would naturally have, that effect; nor that the transaction was made to remove the assets of the Columbia from the jurisdiction of the superintendent of insurance. The contract is executed; and it is not even claimed that the directors, in making it, contemplated any fraud upon the directors of either corporation, nor do we see that the creditors of either corporation are losers by the contract. No rescission can now be made that would put the contracting parties in *statu quo;* nor can we conceive of a decree that would at all approach such a consummation; and any interference now, looking to a rescission, would be merely to make confusion worse confounded, without, so far as we can see, tending to establish any legal or equitable claims of these companies or their creditors.

We are of opinion that the judgment of the circuit court ought not to be disturbed. It is so ordered.

All the judges concur.