89 433
104 365
89 433
s141 120

KINEALY V. MACKLIN *et al.*, *Plaintiffs in Error.*

1. **Voluntary Conveyance** : SUBSEQUENT CREDITORS. A voluntary deed from a husband to a trustee in trust for the grantor's wife, no badge of fraud being connected with its execution, and the husband not being indebted at the time, and not contemplating becoming indebted in the future, will pass the title out of the husband to the trustee for the use of the wife, and is valid as against subsequent creditors of the husband.

2. ———— : ———— : LOST DEED : NOTICE. Although the deed had been lost and had never been recorded, it is valid as to all affected with notice of its execution. And where the husband told a subsequent creditor, at the time of contracting a debt, that he owned no property, this was sufficient to put the creditor upon inquiry.

3. **Deposition.** A paper in this case purporting to be a deposition excluded from the consideration of the Supreme Court.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*A. J. P. Garesche* for plaintiffs in error.

Acquired by champerty, plaintiff's title is invalid. *Arden v. Patterson*, 5 John. Ch. 44; *Weakley v. Bell*,

13 Ohio 75 ; *Webb v. Armstrong*, 5 Humphrey, 381 ; *Rives v. Weaver*, 36 Miss. 383 ; *Barber v. Barber*, 14 Wis. 143 ; *Greenman v. Cohie*, 61 Ind. 206 ; *Gilbert v. Holmes*, 64 Ill. 556 ; *Cardwell v. Spring*, 7 Dana [Ky.] 39 ; *Mark v. Jordan*, 3 B. Mon. 116 ; *Hermann v. Brewster*, 7 Bush [Ky.] 355 ; *Crawley v. Vaughan*, 11 Bush [Ky.] 517 ; *Coughlin v. Railroad*, 71 N. Y. 452 ; *Vincent v. Ashley*, 5 Humph. [Tenn.] 594 ; *Dowell v. Dowell*, 3 Head, 504 ; *Barnes v. Strong*, 1 Jones Eq. [N. C.] 100 ; *Hermann v. Brewster*, 7 Bush [Ky.] 357 ; *West v. Raymond*, 21 Ind. 305. Champerty is *malum in se*. 2 Bacon's Abridg't. 186 ; Weeks on Attorney's, 166 ; *Brown v. Beachamp*, 5 Mon. [Ky.] 416. And our statute adopts the common law. R. S., secs. 3117, 3118 ; *Duke v. Harper*, 66 Mo. 52. There is no estoppel against a married woman. 2 Bish. on Mar. Wom., sec. 489 ; *Donegal v. Frazer*, 3 Mo. 31. There is equity in the defence. *Smith v. Smith*, 50 Mo. 264 ; *Rodgers v. Bank*, 69 Mo. 560 ; *Kidwell v. Kirkpatrick*, 70 Mo. 216. Kinealy was a subsequent creditor with actual notice. 2 Bish. Mar. Wom., secs. 757, 765. The admissions of Mr. and Mrs. Macklin against each other were not competent, because of less weight than their evidence, and they cannot be witnesses, with the exception where the wife acts as her husband's agent. *Funkhouser v. Payne*, 13 Ark. 297 and cases cited ; *La Grace ex rel. v. Peterson*, 2 Sandf. 338 ; *Johnson v. Slater*, 11 Gratt. 321. Of course Mrs. Macklin's statements, if in shape of a deposition under authority of *Charleson v. Hunt* and *Kritzer v. Smith*, would be competent. But they lack caption and certificate. And notary don't say that latter was waived. Don't remember. But the parties swear positively that they were to read and revise them. Notary's certificate of waiver of signature extra-judicial. Weeks' Dep. sec. 274 ; *Clarke v. Goode*, 6 J. J. Marsh. 637 ; *Taylor v. Whiting*, 4 Mon. C. R. 366. At best they were copies, hence inadmissible, since Mr. and Mrs. Macklin both survived. *Fol-*

*lett v. Murray*, 17 Vt. 530. Taken in short hand ; parties
never having read them when written out in full, even
if in form of caption and certificate, would be inad-
missible, because unfinished. Weeks' Dep., sec. 320 ;
*Dannefelser v. Vogel*, 27 Mo. 47; *Cole v. People*, 2
Lansing [43 N. Y.] 508. This court ruled otherwise once,
but because witness was dead. *Wood v. St. Bt. Fleetwood*,
27 Mo. 47. To permit such evidence would authorize par-
ties at every trial orally to prove the oral evidence of
either party at a former trial. And half of the conflict
would be how party then testified. *Hoover v. Jennings*,
11 Ohio, S. R. 625 ; *Carter v. Buckner*, 3 Blackf. [Ind.]
315 ; *Carter v. Edwards*, 16 Ind. 240 ; *Putnam v.
Crombie*, 34 Barb. [N. Y.] 238 ; *Hayward v. Barron*,
38 N. H. 370 ; *Rippowan Co. v. Strong*, 2 Hilton C. P.
R. 453 ; *Jessup v. Cook*, 6 N. J. L. 438.

*M. Kinealy pro se.*

NORTON, J.—This suit was instituted in the circuit
court of the city of St. Louis to set aside as fraudulent
a certain deed executed by defendant conveying to de-
fendant Haydell, in trust for the wife of said Macklin,
certain lots in the city of St. Louis. Judgment was ren-
dered in plaintiff's favor, which was affirmed by the St.
Louis court of appeals, from which judgment defendants
have prosecuted their writ of error to this court.

It appears from the record that in 1871, Patrick
Macklin, as surety for one Day, executed a note, payable
in six months, to William B. Ferguson as administrator,
for $546.95. The note not being paid, said Ferguson
brought suit on the same, returnable to the October term,
1872, of the St. Louis circuit court, and on the ninth day of
November, 1873, obtained judgment for $626.06. Execu-
tion was issued upon this judgment, which was levied by
the sheriff upon four houses, two of which were, before the
sale, allotted to defendant as homestead ; the other two

were sold and were bid off by plaintiff, Kinealy, at twenty-
five dollars each, and he received a sheriff's deed for the
same in February, 1874. Basing his right upon this deed,
plaintiff seeks in this suit to set aside as fraudulent a
deed executed and acknowledged by defendant, Macklin,
on the fourteenth of May and recorded on the fifteenth,
1873, conveying the property in controversy to defendant,
Haydell, as trustee for his wife. This claim is resisted by
defendants on the ground, that the property was pur-
chased with the separate money of the wife, and was
hers in equity ; and that her husband in making said
conveyance was only executing the trust of which said
Ferguson and plaintiff had notice when the note was
signed by Macklin. The answer also sets up that in
October, 1870, said Macklin conveyed the property to
one Mackey as trustee for his wife, Ann Macklin, and
gave it to Mackey to record, but that he died before
recording it ; that said deed was lost, and the deed of
1873 was made in place of it.

It also sets up that the arrangement made between
Kinealy and Ferguson, under which Kinealy bought the
property at the sheriff's sale was champertous. It appears
from the record that Patrick Macklin acquired title to the
lots in controversy in 1858 and 1859, and the first ques-
tion presented is, were the lots purchased with the sep-
arate money and means of Mrs. Macklin so as to impress
the property with a trust in her favor. The evidence
very clearly establishes the fact that Mrs. Macklin, pre-
vious to her marriage, which occurred in 1856, was a pru-
dent, industrious, thrifty woman, and had accumulated
considerable money, and became the owner in her own
right of a lot in Stoddard's addition to the city of St.
Louis which she afterwards, about 1859, sold to E. M.
Buckingham, who testified that the consideration was
twelve hundred dollars ; that he paid five hundred dol-
lars cash to Mrs. Macklin and gave his notes for the
balance ; that soon after the sale the Macklins commenc: ..

building on the lots; that at that time Mrs. Macklin was carrying on the millinery business in connection with a grocery store. Mrs. Harkness testified that she had known Mrs. Macklin from a girl, that she was always industrious, that she knew her at Barnum's hotel when she was doing fine embroidery work for Mrs. Barnum; always had plenty of money which she saved; that she got money from Canada, and knew her father to give her three or four hundred dollars. Mrs. Donnelly testified that it was Mrs. Macklin's money that built the houses. Rodemacker testified that he did the carpenter's work on the houses built in 1868 and 1869 under a contract with Mrs. Macklin, who paid him for the work, and that Macklin had nothing to do with it. O'Neil testified that he was a banker in the city, and had in his possession the books of account kept by Bishop Kendrick, of deposits made with him by his parishioners, and others; that the Bishop received deposits from his parishioners as a banker; that the account showed that Mrs. Macklin during the years 1858-9 deposited with the Bishop, deposits, aggregating $1646.99, the first of which was made sixth of February, 1858, amounting to $504.50 and the last on the eighth of June, 1859, amounting to $313.18; all of which was drawn out at various times during the said years, the account being closed June 8, 1859.

Macklin testified that when he married he only had from sixty dollars to seventy-five dollars, and was not engaged at that time in any business; that his wife's money bought and paid for the lots and houses; that she conducted the grocery business, with her own means; that he entered the army during the late war and remained in the service about two years; that during his absence his wife and her father carried on the grocery business, and that she carried it on after his return; that he was employed in the postoffice, after his return, for about two years at a monthly salary of thirty-five dollars or forty dollars. He also testified

that some time after his return from the army his wife stated, that in payment of taxes during his absence, she first learned that he had the lots conveyed to himself, and requested him to convey the same to her, as she had bought and paid for the lots, and put the improvements on them, with her own means; that in 1870 he procured J. D. Mackey, an attorney, to prepare a deed, conveying said lots to said Mackey in trust for his wife, which was executed and acknowledged, and delivered to said Mackey to be put on record; that he paid Mackey for drawing the deed and also gave him money to pay for recording the same, and produced the following receipt:

"$6.50.                    St. Louis, October 12, 1870.
    "Received of Ann Macklin $6.50 for making out a deed of her property situated on northwest corner of West Eighteenth street and Water Works street.
                              " J. D. Mackey."

He testified that Mackey signed the receipt, and the signature was shown by Rodemacker to be in the hand writing of Mackey. Macklin's evidence as to the execution and delivery of the deed and receipt was corroborated by that of Mrs. Macklin, and Rodemacker. Macklin further testified that two or three years afterwards he learned that the deed had not been recorded by Mackey, who drank very freely of intoxicants before his death which occurred in June, 1875, in the city hospital; that then he went with Dr. Grayson to find Mackey, who promised to prepare another deed in place of the one he had lost, but in consequence of his habits, he procured another attorney to draw a deed conveying the property to defendant, Haydell, in trust for his wife which is the deed plaintiff is seeking to set aside as fraudulent. This witness is corroborated by Dr. Grayson as to his seeking for Mackey after he learned the deed had not been recorded.

In 1870 when the deed to Mackey as trustee was executed, Macklin testified that he did not owe a single dollar to any one and there is no evidence whatever in the case that he did. He also testified that when he executed the deed in question to defendant, Haydell, as trustee, that he did not owe any debt except the Ferguson debt. Plaintiff sought to contradict him in this particular by showing that he had executed two notes to Mrs. Stevens in 1872 as security for one Day ; one for eighty-nine dollars and one for $173.50 ; also by showing a record of a suit brought upon these notes, and execution levied on Day's property, a sale of it, and return of execution unsatisfied as to the larger part of it. Macklin testified that he was not aware of the notes being unpaid until notified by Mrs. Stevens, and she testified that Day had more than sufficient personal property to pay the debt had the sale been properly conducted, and that she looked to Day to pay it. The evidence is conflicting as to what occurred on the twenty-fifth of November, 1871, when the note to Ferguson was executed by Macklin as security for one Day, which note culminated in a judgment in December, 1873, and a sale of the two lots in question to plaintiff in February, 1874, at twenty-five dollars each. Ferguson testified that as administrator he had sold Day certain personal property amounting to $542.95; that he went with Day to Macklin's to get him to sign the note as security for Day ; that Macklin at first refused to sign it, and after being there about an hour, during which time he was being urged to sign the note, he finally signed it at request of his wife ; that he did not hear Macklin say before he signed it that he owned no property and that nothing could be made out of him ; that he did not remember seeing any one then except Mrs. Macklin, Day and his wife, and Mr. Hutchison. Hutchison, who was a part of the time outside in a buggy, and on the pavement, confirms Ferguson.

On the other hand, Macklin testified that he refused to sign the note, saying that he owned no property, and that nothing could be made out of him, and that he was finally induced to sign it, on being told that it was a mere matter of form.   His evidence as to his refusing to sign the note, saying he owned no property, is corroborated by that of Dr. Grayson, Mrs. Maher and Rodemacker. The evidence is also conflicting as to what occurred at the execution sale.   Ferguson testified that he was present at the sale but did not bid ; that Kinealy was his lawyer and obtained the judgment on the note, and was also present at the sale about to be made under the execution, which issued on the judgment ; that Kinealy bid off the property for himself ; that Kinealy did not tell him that he would bid on the property, and if the sale held good he would pay him the balance of the judgment or note ; that no arrangement of this sort was made, but witness stated as a fact that Kinealy did afterwards pay him the face of the note and that, thereupon, he assigned him the judgment.   The evidence of Kinealy, taken at a former trial, was read, in which he stated that he was the attorney who brought the suit and obtained the judgment for Ferguson against Macklin, under which the property was sold ; that he bought the property for Kinealy ; that Ferguson had no interest in it ; that he had an agreement with Ferguson before the property was knocked off to him ; that Ferguson expressed the intention to bid the amount of his debt; that when the sheriff put up the property he, Kinealy, appealed to Macklin to bid, who made no response ; that Ferguson, when he saw there was no bidding, and that there was going to be a lawsuit, told him he would not bid, and he, Kinealy, then said, "I will bid, and I will take the chances on it, and if the execution sale holds good I will pay the debt," to which Ferguson replied all right, go ahead and bid, and "I went ahead and bid."

It is contended by plaintiff that the money possessed

by Mrs. Macklin at the time of her marriage, as well as that earned by her subsequently, became the money of her husband, and that the property bought and improved with it was his unaffected by any trust in favor of the wife ; and that if, in fact, the property was held by him in trust for his wife, that plaintiff is not affected by it for want of notice. It is true that previous to 1875, a marriage without anything further, both in law and equity, transfers to the husband absolutely all her choses in possession, unimpressed with any trust in her favor, created or manifested by the mere act of reception. *Woodford v. Stephens*, 51 Mo. 445–8. While it is announced in the case of *Terry v. Wilson*, 63 Mo. 493, that where the wife is possessed of chattels or money the possession of the wife is the possession of the husband, and such money and chattels belong to him, the doctrine is also announced that the "husband may undoubtedly * * * make a direct gift to his wife which will be upheld in equity, if the same be delivered to her, and his intention to create a separate property in respect thereto be at the time clearly and constructively manifested. * *. * But in the contemplation of courts of equity the wife may have a separate existence and possession, and though the possession of the wife is *prima facie* the possession of the husband such possession may be shown to be separate and distinct in her. * * * And so if the wife have choses in action, and the husband should, at the time of appropriating them, make positive, precise, and clear declarations that he took the same only as her trustee and should promise to account for them to her, the wife could claim the fund used as her own even against his creditors."

In the case of *Pawley v. Vogel*, 42 Mo. 303, it is said : "A voluntary settlement in favor of the wife by a husband who is not indebted at the time, cannot be impeached by subsequent creditors *merely* on the ground of its being voluntary. But if he were indebted at the time, or if it

were made with a view to being indebted at a future time, it will be void against creditors prior and subsequent.". The case of *Tennison v. Tennison*, 46 Mo. 77, is only overruled by the case of *Woodford v. Stephens*, 51 Mo.. 445, as to the remark made by the judge who delivered. the opinion, to the effect, "that the husband in receiving personal property coming to him by the marriage is,. in equity, to take it as the separate property of the wife," but it is not overruled in so far as it asserts the doctrine, "that when it is agreed between husband and wife that the former should invest certain money, the property of the wife, in lands for her use, and should take the title in his own name, that he would be regarded in equity as trustee for her."

Applying the principles enunciated in the above cited cases to the facts in evidence in this case, as to the purchase of the lots in controversy and improvements put upon them, with the money of Mrs. Macklin, deposited by her with Bishop Kendrick (which was a chose in action never reduced to possession by Macklin so far as the evidence shows), and the money derived from the sale of her real estate to Buckingham, and money earned by her as a milliner and keeper of a grocery store, both before the war, during Macklin's absence of two years in the army, and after his return, over which money he neither assumed nor exercised control, and these facts clearly indicate that Macklin, in equity, might be regarded as holding the title in trust for his wife. But in the view we take of this case it is not necessary to go to that extent. Under the authority of the cases of *Pawley v. Vogel*, and *Terry v. Wilson*, *supra*, the deed executed by Macklin to Mackey, in 1870, conceding it to be voluntary, had the effect of passing the title out of Macklin to the trustee for the use of Mrs. Macklin, for at that time there is not a scintilla of evidence that Macklin owed a dollar or was indebted to any one, or that he made the conveyance in view of becoming in-

debted at any future time, and we are driven to the con-- clusion from all the evidence that the execution of this deed was prompted by none other than honest motives, and from a sense of justice and right unaccompanied with any badge of fraud, for there were no creditors in existence to be defrauded, and none contemplated in the future.

But it is said the execution and delivery of this deed was not satisfactorily proved. We think otherwise. In order to arrive at the conclusion that said deed was not executed and delivered, we would not only have to believe that Macklin, Mrs. Macklin and Rodemacker had committed perjury, but that one of the three had committed a forgery. This we are not prepared to do. But it is said that Macklin and Rodemacker were impeached. It is true that one witness, and but one, testified that Rodemacker's reputation was bad for truth, but it was shown that this witness had been prosecuted by Rodemacker for mayhem in biting Rodemacker's fingers in a fight. So as to Macklin, an equal number of witnesses on each side testified as to his reputation, one set saying his reputation was bad, the other saying it was good. It is also urged that Mrs. Macklin in the first trial did not say anything about the Mackey deed. She gave as a reason for this that Kinealy had told her that a deed that was not recorded was not good.

Did Ferguson or Kinealy have knowledge of Mrs. Macklin's claim or such information as would have led them to this knowledge had they pursued the inquiry? It was testified to by witness Meire, who with his partner leased the premises in 1872, that he and his partner wanted Mrs. Macklin to sign the lease, and that she said Macklin owned the property and it was no use; that his partner wanted Mrs. Macklin to sign the lease; that he had learned from the people in the neighborhood that she owned the property. Macklin, repeatedly, as testified to by him, Dr. Grayson, Mrs. Maher and Rode-

macker told Ferguson during the hour he was being urged and persuaded to sign the note, that he owned no property. This was sufficient to put him upon enquiry, and he says that after the execution of the note he did find that the title of record was in Macklin, and then he stopped. Had the enquiry been pushed farther by having Macklin to explain to him why he had said he owned no property, when the record showed the title to be in him, it would doubtless have led him to the knowledge that Meire's partner learned from the notoriety of the fact in the neighborhood that Mrs. Macklin was the equitable, if not the legal owner of the lots. This he did not do, but according to Kinealy's evidence, who was his attorney, when he saw there was to be a lawsuit, told Kinealy that he would not bid, and permitted Kinealy to bid on his own account and buy the property, worth several thousand dollars, at twenty-five dollars for each of the two lots, who, it seems, without further inquiry, was willing to take the chances, agreeing with Ferguson that if the sale held good, he would pay him the balance of the debt, which it seems he subsequently did, by giving Ferguson a receipt for two hundred dollars attorney's fee, and his note for the balance, making the whole equal to the face of the note, and taking an assignment of the judgment.

We have eliminated from our consideration of this case the long-hand report of Holland and Wallridge of a so called deposition of Macklin and wife, taken at the office of plaintiff, before the issues in this case were made up ; Mrs. Macklin, while still suffering from sickness incident to giving birth to a child, was forced to appear at the office of plaintiff. She was examined under circumstances of excitement during which one of plaintiff's attorneys threatened "to kick her damned husband's head off." Her statements were taken down in shorthand ; the so called deposition had no caption ; it was not signed nor signature waived ; it was not complete,

and ended with an unanswered question; had never been filed in court, and according to the evidence of the notary, was not intended to be filed as a deposition, but was intended for the use of Kinealy.

From an examination of the whole record we are of the opinion that it does not disclose such a case as to call for the exercise in plaintiff's behalf of the equitable powers of the court, and the judgment of the court of appeals affirming that of the circuit court is reversed and the bill dismissed.