MANUFACTURERS' SAVINGS BANK, *Appellant*, v. BIG MUDDY IRON COMPANY.

1. **Evidence**: FINDING : REFEREE. Where there is evidence to sustain the finding of a referee, and there is no clear showing of mistake, it will not be disturbed.

2. **Practice in Supreme Court**: ABSTRACT OF EVIDENCE. Where the appellant fails to furnish an abstract of the evidence in the supreme court, the court will decline to examine a great mass of evidence found in the manuscript record.

3. **Corporation**: DIRECTORS : SALE. It is the duty of the directors of a corporation to pay the debts of the company and they are justified in using the corporate property for that purpose, although the company be thereby disabled from carrying on its business, provided they act in good faith.

4. ——— : ——— : ———. The mere fact that the directors sell the property of the corporation to a new corporation of which they are directors and stockholders will not make the sale absolutely void.

5. ——— : ——— : ———. Where a corporation is insolvent and unable to continue its business, and the directors sell the corporate property to a new corporation of which they are the officers and stockholders, stockholders of the old corporation who complain that the property sold for less than its value can recover only the losses sustained by the old corporation by reason of the price received. And it appearing that the property sold for more than its worth and that the old corporation and its stockholders were the gainers and not the losers by the transaction, they are not entitled to relief.

6. ——— : STOCKHOLDER : ESTOPPEL. A stockholder who takes part in making and perfecting a sale of the corporate property and who afterwards ratifies such sale will not be heard to complain that the property sold for less than its value.

*Appeal from St. Louis City Circuit Court.*—HON. W. H. HORNER, Judge.

AFFIRMED.

*G. Pollard* and *Krum & Jonas* for appellant.

(1) The finding of the referee was erroneous. (2) The assignment by White and the transfer of the stock on the books of the corporation, vested the title to the stock in Harding, as trustee for the bank, and fixed and determined the relations of White, assignor, and Harding, the assignee, to the corporation. By that act White ceased to be, and Harding became, a stockholder in the company ; and White lost, and Harding acquired, the right to vote the stock.

*H. I. D' Arcy* for respondent, Whitman.

(1) Laches or delay of a stockholder is peculiarly fatal to his claim for equitable relief against directors. *Kitchen v. Railroad,* 69 Mo. 224–69 ; *Watts' Appeal,* 78 Pa. St. 370 ; *Thompson v. Lambert,* 44 Iowa, 239–47 ; *Richards v. Ins. Co.,* 8 Cranch, 84 ; *Elman v. Kendrick,* 1 Metc. [Ky.] 146 ; 9 Cent. L. J. 288. (2) Plaintiff cannot recover, because the defendant directors, in taking White's vote on the question of selling out, thought, and had every reason to think, there having been no transfer of his stock, on the books, to plaintiff, that he, and only he, was the proper party to vote the stock standing in his name. 6 South. L. Rev. 398 ; *Denny v. Manhattan Co.,* 2 Denio, 115 ; *Abbot v. Meriam,* 8 Cush. 588 ; *The State v. McDonald,* 4 Harv. 555 ; *Ex parte Murphy,* 7 Cow. 153 ; *Hoppin v. Buffern,* 9 R. S. 513. It is even immaterial that an exhaustive examination of all the books and papers of the company might have revealed the fact that White had parted with all or some of his interest in the stock to plaintiff. Directors are not bound to search any but the proper record. *Marlborough M. Co. v. Smith,* 2 Conn. 579 ; *Railroad v. McCormick,* 10 Ind. 499. (3) Plaintiff cannot

recover, because the majority of the stockholders of the manufacturing corporation have a right, notwithstanding the dissent of a minority, to sell out the assets of the corporation, in the exercise of their business judgment. *Treadwell v. Man. Co.*, 7 Gray, 485 ; *Sargent v. Webster*, 13 Met. 504 ; *Kean v. Johnston*, 9 N. J. Eq. 401 ; *Black v. Canal Co.*, 22 N. J. Eq. 404 ; *Wilson v. Proprietors of Bridge*, 9 R. I. 599 ; *Lauman v. Railroad*, 30 Penn. St. 48 ; *Lord v. Governor*, 2 Phillips, 739 ; *Wilson v. Miers*, 10 C. B. R. [N. S.] 366. Indeed the directors have a right to close up a business corporation. *Chew v. Ellingwood*, 86 Mo. 273. And in Missouri against the expressed will of the stockholders. *Hutchinson v. Green*, 91 Mo. 367.

*Geo. A. Castleman* for respondent, O'Reilly.

(1) The defendant company was insolvent in December, 1872, and had been so from the day of its organization, therefore defendants had a right, under the law, to sell out the property of the company. (2) The sale of the property by the old company to the new was not an annihilation of the business, but was tantamount to a reorganization, changing the basis of organization from one whose failure and ruin was demonstrated to one wherein it was hoped that the wreck might be resurrected. (3) Benjamin White was the owner of the one hundred and fifty shares of stock under the alleged right of which this suit is prosecuted, and the plaintiff herein was only pledgee thereof and did not become owner until the fall of 1873. Benjamin White had, therefore, the right under the law to vote this stock for the sale. White did vote the stock for the sale, and would have been estopped to complain of the defendants. Plaintiff, by its purchase after the sale, took with it only such rights as could have been enforced by White. Therefore, even if the company had been

solvent, plaintiff could not recover.  (4) Bulkley swears that notice of the transfer of this stock was served upon him and he knew it was absolute, but he did not inform the stockholders thereof, although he was present and saw White vote the stock, and kept silent as to White's alleged transfer.  This was a violation of duty upon the part of Bulkley, was a wrong perpetrated by him upon the stockholders, and equity will not now permit him to speculate upon his own wrong.

BLACK, J.—This is a suit begun by the plaintiff and now prosecuted in its name for the purpose of compelling the directors of Big Muddy Iron Company to account for property which it is alleged they fraudulently and secretly sold, and by reason of which alleged fraudulent and secret sale it is claimed the stock held by the plaintiff was rendered worthless.  It is also alleged that the defendants converted to their own use pig iron of the value of $126,000.

It appears that Benjamin White owned seventy-five shares of preferred and one hundred and fifty shares of common stock in the Big Muddy Iron Company.  He transferred this stock to Mr. Harding, president of the plaintiff, a banking corporation.  The transfer is absolute on its face ; but it was made to secure a debt owing by White to the bank.  The transfer was made in November, 1872, and in the fall of 1873, the bank caused the stock to be sold and became the purchaser of it. This suit was commenced in 1874, and slumbered along until 1879, when the bank transferred the stock to Cook, who transferred the one-half to P. C. Bulkley, and this suit seems to be prosecuted by them in the name of the bank.  It may be here stated that Bulkley was a director and the secretary of the Big Muddy Iron Company, during the entire time of its existence, though it seems he opposed the sale of which complaint is made.

The general facts are not disputed and they are

these : The defendants, O'Reilly, Whitman, Mills, Lancaster and White and other persons purchased an iron furnace and certain personal property at an assignee's sale in bankruptcy, on the twenty-third of March, 1872, for $139,000. They were stockholders in and. creditors of the bankrupt corporation. On the fifth of April, 1872, they organized the Big Muddy Iron Company, transferred the property so purchased to it, and the corporation became liable for the payment of the $139,000. The company was organized with 1,570 shares of stock of the par value of two dollars per share. But nine hundred and thirty shares of stock were ever taken, so that the company had a capital of only $1,860. The company conducted the business until the last of December, 1872, when it became involved, unable to pay its debts, and the directors sold the furnace to a new company by the same name. This new company was organized with a capital of $200,000 for the express purpose of buying the property of the old company, and the defendants were stockholders and officers in the new company, so that in effect the sale was one by themselves to themselves.

So far as the manufactured pig iron on hand is concerned, it is sufficient to say that it was sold by the directors in the usual course of business for about $105,000, and the proceeds were applied to the payment of the debts of the company. This they had a right and were in duty bound to do.

The sale to the new company included the furnace, machinery, implements and raw material on hand. The new company paid for the furnace and existing contracts for material, the sum of $156,000. It also took the raw material on hand at the cost price. There were other assets, such as bills receivable, not included in the sale. It is this sale of which complaint is made. The plaintiff alleges that the old company was solvent and

was doing a large and profitable business in the manufacture of pig iron at the time of this sale, and that the sale rendered the stock worthless. The case was heard by a referee who made a report and upon which there was judgment for the defendant.

For the purpose of determining whether the company was solvent when the defendants made the sale, the referee made an estimate of all the assets at that date. The sale did not take effect until the first of January, 1873, and this is made the date of the estimate. In this estimate the referee places the furnace and works at $129,120, and the plaintiff insists that it should have been put down at not less than $156,000. The evidence of the value of the furnace ranges from $70,000 to $250,000, so that there is abundant evidence to support the finding of the referee, and it will not be disturbed. He places the value of the pig iron on hand at $105,335. This value he gets by taking the sales of it actually made, and it was clearly the correct method, for it appears that the accounts of iron made and shipped, as they were kept at the furnace, were unreliable and conflicting. Objections were also made to other of the items of this estimate, but the plaintiff has furnished no abstract of the evidence and for this reason we decline to go through the great mass of evidence found in the manuscript record. The referee gives his detailed findings on these disputed items and his reasons for his conclusions as to the amounts to be set down, and with them we are satisfied. The report shows much care taken by the referee on the trial, and is not to be disturbed as to the finding of facts, except upon a clear showing of mistake, and that has not been done in any instance.

The referee places the assets at $304,023 and the liabilities at $288,942, thus showing a surplus of a little over fifteen thousand dollars. But these assets were not money and the company needed a large amount of

cash to enable it to go on with its business, and the assets were not available at the prices stated, and hence the referee finds that the company "was insolvent; and that it was not possessed of sufficient assets wherewith to pay its liabilities in the usual course of business as they matured ; nor sufficient assets to meet and discharge its liabilities by any usual or ordinary disposition and application of the same." He also finds that the $156,000 was paid by the new company in debts of the old company, which debts were for the most part held by the defendants and were then cancelled ; that the sale was open and authorized and ratified by a majority of the stockholders in open meetings called for that purpose. Many efforts had been made to sell the property, and we do not see that the company' had any prospect of making a sale to persons, other than the defendants, for a price in excess of $75,000. This seems to have been the highest offer made, yet the defendants, for the new corporation, took the same property in payment of debts to the amount of $156,000.

We held in *Hutchinson v. Green*, 91 Mo. 367, that when a corporation became unable to meet its obligations in the usual course of business, the directors could make a voluntary assignment for the benefit of all of the creditors, and that they could do this without the consent of stockholders. So, too, it is the duty of the directors to pay the debts of the company ; and they are justified in using the property for that purpose ; they may use the property for such a purpose, though the company be thereby disabled from carrying on its business, if they act in good faith. Morawetz on Priv. Corp. [2 Ed.] sec. 513. Here, the corporation was insolvent, unable to go on with its business. As said by the referee, it had to go into liquidation of some sort. Had this sale been made to persons other than the directors themselves, its validity could not be questioned by the stockholders in any form of action.

Directors of a corporation have no right to use their official position for their own benefit; nor can they represent the corporation and themselves in the same transaction. They may be made to account to the corporation for all profits made by the use of the corporate property. *Ward v. Davidson*, 89 Mo, 440; *Keokuk Packet Co. v. Davidson*, 95 Mo. 467. But according to what we held in *Kitchen v. Railroad*, 69 Mo. 224, the mere fact that these defendants were directors and stockholders in the selling and purchasing corporation would not make the sale absolutely void. We do not understand it to be claimed here that this is a suit to avoid the sale. It is rather claimed that the property was sold at less than its value, and if that were true the defendants should account for the difference. The sale standing as an accomplished transaction, and the selling corporation having received the full benefit of it, it would seem to follow that the defendants should be held only for losses sustained by the old corporation by reason of the price received. The property sold for all, and indeed for much more, than it was worth, and the old corporation and its stockholders were the gainers, not the losers, by the transaction. This old corporation came into existence with an actual capital of $1,860, and a debt of $139,000, and it is perfectly clear that during its short career of about nine months it was at all times insolvent, a mere shell, and that the stock never had any intrinsic value.

From November, 1872, to the fall of 1873, the plaintiff held this stock as collateral security only. In the meantime Mr. White, the owner of it, took part in making and perfecting the sale. At a meeting of the stockholders, held on the second of December, 1872, he voted in favor of selling the property; and at another like meeting held on the first of February, 1873, he voted to ratify the very sale of which complaint is

made.   That conduct put it out of his power to prose-
cute this suit.   Since he had a right to vote the stock
under sections 934, 935, Revised Statutes, it is insisted
that the bank also became bound by the ratification;
but in view of what has been before said, we need not,
at this time, pass upon that question.

The judgment is affirmed.   BARCLAY, J., not sit-
ting ; the other judges concur.