THE MICHIGAN SLATE COMPANY v. THE IRON RANGE & HURON BAY RAILROAD COMPANY.

*Corporations—Principal and agent—Estoppel—Evidence—Statute of frauds.*

The main features of this case involve the statement of many facts, and an examination of the entire opinion is essential to a correct understanding of the points decided. The principles found to be established in *Hirschmann v. Railroad Co.*, 97 Mich. 384, to which reference is had, are held to have been fully established in this case.

Error to Baraga. (Haire, J.) Argued June 21, 1893. Decided June 16, 1894.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*Wells, Angell, Boynton & McMillan* (*Ashley Pond*, of counsel), for appellant.

*Philip T. VanZile* and *Frank E. Robson*, for plaintiff.

LONG, J. This action was commenced by attachment to recover against the defendant company the value of certain merchandise. Plaintiff claims under a written guaranty, signed by Milo Davis, chief engineer of the railroad company, as follows:

"Iron Range & Huron Bay R. R. Co.
"Milo Davis, Chief Engineer and Superintendent of Con-
    struction.
        "Arvon, Mich., May 23, 1891.
"Michigan Slate Company,
        "Arvon.
"*Gentlemen:*   Please deliver to Wallace Dingman such
supplies as he may order for the construction of the
I. R. & H. B. R. R.; until further notice, and the same
will either be taken out of his estimate from month to
month, or taken from his final estimate, or, in case of his
failure to complete the job, from last estimate given him,
as the case may be, if not otherwise paid; and the Mich-
igan Slate Company is hereby guaranteed against any loss
from said Dingman's failure to pay for any goods, tools,
and supplies of all descriptions furnished from this date.
            "Milo Davis, Chief Engineer."

Claim is also made upon the common counts in *assump-
sit* for goods sold and delivered.   A bill of particulars
was filed, showing a claim of indebtedness of upwards of
$36,000.   The plea was the general issue, and there was
also filed and served an affidavit of C. H. Buhl, president
of the defendant company, to the effect that the railroad
company never executed or caused to be executed the
written agreement counted upon in the plaintiff's declara-
tion, and that Milo Davis, chief engineer, mentioned in
the declaration, had no authority to execute any such
promise or agreement in behalf of the defendant company.

It appears that on June 30, 1890, articles of association
of the defendant company were filed in the office of the
Secretary of State.   The purpose of the incorporation, as
stated in the articles of association, was the construction
of a railroad from some point on Huron Bay, Baraga
county, Mich., through the counties of Baraga and Mar-
quette, to the towns of Champion, Republic, and Michi-
gamme.   On July 26, 1890, a contract was made between
James M. Turner and the defendant company, by which
Turner agreed to undertake forthwith, and to complete

within one year from the date of the contract, so much of
the railroad as lay between some eligible point on Huron
Bay, Baraga county, and the village of Champion, Mar-
quette county, together with all necessary ore docks, station
buildings, etc.   On July 27, 1890, an agreement was signed
between Christian H. Buhl and Henry Stephens, of Detroit,
and James M. Turner, of Lansing, the substance of which
was that, while the said Turner was to take the contract
for the construction of the road in his own name, yet he
was to act as much for and in the interest of said Buhl
and Stephens as for the interest of himself; and the con-
tract then set forth the relative rights and obligations of
Buhl, Stephens, and Turner under it.   August 16, 1890, a
contract was made between Wallace Dingman, of Battle
Creek, Mich., and said James M. Turner, by which the
said Dingman agreed to do all the grading, clearing, grub-
bing, etc., on said railroad, and to complete the same on
or before August 1, 1891.   Prior to the time of the organi-
zation of the defendant company, Milo Davis, a civil engi-
neer, had been sent by Mr. Turner to make a preliminary
survey of the route which the contemplated railroad was
to follow.   After the organization of the company, on
recommendation of Mr. Turner, an arrangement was made
with said Davis by which he was to act as chief engineer
of the company.   It was also arranged that Mr. Charles
M. Turner, who was the superintendent of the plaintiff
company, should act as the auditor of the defendant com-
pany.   James M. Turner was the president and treasurer
of the Michigan Slate Company, and largely interested in
it pecuniarily.

   The claim of the plaintiff company is that it is entitled
to recover against the defendant company for so much of
the goods described in the bill of particulars as were fur-
nished prior to May 23, 1891, or up to the time the writ-
ten guaranty was made, because of certain oral arrange-

ments which it claimed to have made through its superintendent, Charles M. Turner, with Milo Davis, and approved by James M. Turner; and that for the balance of the goods the defendant company is liable by virtue of the written guaranty above set out. The written guaranty, it is conceded, though dated May 23, 1891, was not written and signed until after that date, and, as plaintiff seems to claim, some time in June or July. On the part of the defendant testimony was offered, which, it is claimed, tended to show that neither Turner nor Davis had any authority, either by virtue of the positions held by them or by virtue of any power conferred on them by the railroad company, to buy any goods on the credit of the company to be used by the contractor or subcontractors or boarding-house keepers, or to make any promises for the payment therefor; and that, if such purchases or such promises were made, they were made without the knowledge or consent or ratification of the company; that Milo Davis never had any authority to make the written agreement declared upon, and that the company had no knowledge that such agreement had ever been made.

The main features of the case relative to the organization of the defendant company, its contract with James M. Turner to construct its road, as well as the contract between Turner and Wallace Dingman, together with the appointment of Milo Davis as chief engineer of the defendant company and his powers and duties, are set out in the case of *Hirschmann v. Railroad Co.*, 97 Mich. 384, and will not be repeated here. It was said in that case that—

"The testimony brings the case within any one of several well-established rules:

"1. If the company relinquished to Turner the matter of the construction of this road, and Turner knew that Davis was contracting these obligations in the name and

101 MICH.—2.

upon the credit of the company, Turner must be deemed to have adopted them. His knowledge was the company's knowledge, and the company is liable.

"2. If the officers of the company were advised that Davis had incurred the June indebtedness to plaintiffs in the name and upon the credit of the company, and with that knowledge did not protest, but, on the contrary, corresponded directly with the plaintiffs, and paid that account, plaintiffs were justified in relying upon that action as an assurance of Davis' authority, and extending further credit, and defendant is estopped from denying the authority of Davis.

"3. If Davis, in the exercise of the authority given to him by the contract, in view of Dingman's inability, was prosecuting the work for and on behalf of the company, and incurred this indebtedness in such prosecution of the work, the plaintiffs were entitled to recover.

"4. If Davis was entering into contracts for the work upon the road, employing men and purchasing supplies in the name of the company and upon its credit, and the officers of the company knew of the fact, or had been advised of instances of like conduct, and remained silent, the company cannot now be heard to say that such person so acting was without authority."

It is therefore to be seen whether this case falls within any of the above-mentioned principles.

Some time in August, 1890, Mr. C. M. Turner, as he testifies, commenced selling goods for the plaintiff to Wallace Dingman. Some of these goods were paid for by Dingman, and some by Davis, for the defendant company. The account was balanced, Mr. Turner says, about March 1, 1891, all but $100, which was carried over to the March account. In that month Mr. Davis came to Arvon, and asked him why he did not sell the goods that were wanted at the camps; that a large amount was wanted. Mr. Turner told him that Dingman was in bad shape pecuniarily for so large an amount, when Davis said: "Once you get the business, you get orders for the goods, and I will guarantee that you get your pay. I will see

that you get your pay for the goods." Mr. Turner says that on the strength of this guaranty he obtained the orders from Dingman, and furnished the goods. He further testifies that he called the attention of James M. Turner to the matter, who told him to go ahead, and furnish the supplies. Mr. Turner says that thereafter he ordered a large amount of goods from merchants with whom he dealt, and commenced at once to supply the defendant's camps with them. He continued to do so until June 17, 1891, when he looked over the account with Davis, and settled with him for the goods so furnished to that date, and took from him a time check, showing that there was a balance due the plaintiff of the sum of $9,830.78. The statement was made out to the defendant company, Wallace Dingman, contractor, and indorsed as approved by Milo Davis, chief engineer of the defendant company.

Prior to this, and about the 1st of May, C. M. Turner had called upon Davis for money. There was then due the plaintiff about $10,000, and he procured an order for that amount of money, as follows:

"ARVON, MICH., May 15, 1891.
"IRON RANGE & HURON BAY R. R. CO.:
" Please pay Michigan Slate Company the sum of $10,-029.94, the balance of amount due on account, and charge same to me.
"WALLACE DINGMAN,
. "By Geo. L. Davis.
"MILO DAVIS,
"Chief Engineer."

With this order Mr. Turner was given a letter to Mr. Peirce, chief accountant of the defendant company, as follows:

"ARVON, MICH., May 15, 1891.
"D. R. PEIRCE,
"Chief Accountant I. R. & H. B. R. R.,
"Detroit, Mich.
"Dear Sir: The Michigan Slate Company is in such a

shape that they must have the amount of their bill against W. Dingman. We have barely enough money to pay the rolls, and the only way I could see to help them out was to sign an order on the railroad company for the amount of their bill.

"Yours truly,<br>"MILO DAVIS, Chief Engineer."

Mr. Turner says that at this time James M. Turner had failed in business, and the Michigan Slate Company was in need of the money. He took the order and letter, and came to Detroit to see Mr. Buhl. He testifies that Mr. Buhl told him at that time that they had made up the monthly account of estimates, and had no money on hand for that matter, and could not pay it. He says further that he thinks Mr. Buhl directed him to file the order with Mr. Peirce, but that Peirce objected to it, because at that time it was not signed by Mr. Dingman; that he took it home, and Dingman's signature and O. K. was procured, and he then sent it to Peirce. Mr. Turner further says that he then saw Davis, who assured him that if he continued to sell goods he would get his pay, and that Davis agreed to guarantee the slate company against all loss arising from sales of goods to Dingman, and that Davis afterwards put it in writing. He continued to sell goods under the written guaranty until the balance of the bill was made.

The defendant's contention is that neither Mr. James M. Turner nor Mr. Davis had authority to bind the defendant company. The relation of Mr. James M. Turner to the company was peculiar. He was the originator of the scheme for the building of the road. The contract between Buhl, Stephens, and Turner is fully set out in *Hirschmann v. Railroad Co*, *supra*. The contract provided substantially that the parties associated for the purpose of "constructing, owning, and operating" the road, and that it was to be sold as an entirety within three

years after completion.    Turner was to take all the stock
and bonds for building it; to give his notes for one-third
of the cost, Buhl and Stephens furnishing the entire
money for construction; Turner's one-third of the stock
and bonds to remain in the hands of Buhl and Stephens
as security; the notes to be carried until the road was sold.
It is evident that under this contract the three parties,
Buhl, Stephens, and Turner, regarded themselves as the
sole owners of the road, and of all the rights and interests
therein, and when it was sold they were to divide the
proceeds equally between themselves.    Mr. James F. Joy
had originally entered into the scheme of building the
road, but Mr. Turner says he dropped out, and it was
understood that the money he put in should remain in
the pool, and they would make some arrangement that
would be satisfactory to him about it.    It appears that
Mr. Joy never had anything to do about the matter after
that, but that the three parties went forward with the
scheme as though they were the sole owners.    Mr. Turner
did not sign the articles of association, and he claims he
was left out so that he could take the contract for the
stock and bonds.    These three then became the sole man-
agers of the defendant company.    They consulted no one
else about the management of the affairs of the company,
according to James M. Turner's testimony.    They appointed
Milo Davis as chief engineer, and he was directed by them
to advertise for bids, and the contract for the actual con-
struction was let to Dingman.    This contract was signed
by Turner.    Shortly after it was executed, Davis went to
the Upper Peninsula, and the work of construction com-
menced.    On November 15, 1890, the Dingman contract
was modified, Buhl and Stephens alone making the agree-
ment of modification, and Turner afterwards approving it.
No one else connected with the company appears to have
been consulted, and the work was thereafter carried for-

ward up to September, 1891. The moneys to carry on the
work were sent by the company to Dingman up to some
time in January, 1891, and after that time to C. M. Turner
or Milo Davis, or paid out by checks directly from Mr.
Peirce, the accountant at Detroit. Mr. Davis had sole
charge of the work, except as James M. Turner went up
from time to time to look after it. Mr. Davis had his
instructions from Mr. Turner. The railroad office and
Dingman's office were in the same building, and, for the
greater portion of the time covered by the accounts, Mr.
Clark acted as book-keeper for both parties. Goods were
furnished by various parties upon orders made by Ding-
man, per Clark. Other goods by various parties were
furnished under the direction of Davis, who had arranged
that certain parties were to have goods when needed. The
goods were entered upon plaintiff's books separately against
each camp, and at the end of the month the separate
accounts were posted to Dingman's account. Other parties
besides the plaintiff delivered goods and posted their books
in the same way. At the end of each month requisitions
were made for the amounts needed to pay the various
accounts, and sent along with the monthly estimates, and
paid. Payments were made in this way until about May
1, 1891, when Mr. Davis gave Mr. C. M. Turner, for
plaintiff, the order for the $10,000.

By the terms of the Dingman contract, the defendant
company had the right at any time, if Dingman neglected
or refused to prosecute the work with a sufficient force
to complete it within the agreed time, to take possession
and complete it. It is also contended by plaintiff that in
the fall of 1890, and before the goods in question were
furnished, the defendant company, through Davis, discov-
ered that Dingman was not competent to carry on the
work and finish the contract, and so, availing itself of the
foregoing clause in the contract, the company took charge

of the work, and finally took it fully out of Dingman's hands, and prosecuted it by Davis, though it was nominally carried on in Dingman's name. There are many circumstances which have a strong tendency to support that claim, though some of the letters and statements of James M. Turner are quite contradictory of that theory. However this may be, it is apparent that the matter was left to James M. Turner to manage, and that Davis, acting under Mr. Turner's direction, went forward with the work, or at least directed and controlled it; and that the goods for which suit is brought were furnished by C. M. Turner for the plaintiff, on the strength of Davis' promise that they should be paid for. Testimony was given by other parties who furnished goods, showing that Davis ordered such goods for the company; also testimony showing that some time in April, and from that time forward, Davis hired men for the work, and gave them time checks, which were paid by the company. It also appeared that Davis, in the course of his correspondence with James M. Turner and with Mr. Buhl and others, generally used letter paper which contained the heading of the defendant company, "Milo Davis, Chief Engineer and Superintendent of Construction," and that Davis said from time to time that Dingman was unable to prosecute the work, and the company was completing it. It appeared in this case, as in *Hirschmann v. Railroad Co., supra,* that the June bills, while aggregating a large amount,—over $50,000,— contained an amount going to Dingman of only $250. How the matter of the construction of the road was regarded by the parties is illustrated by the letters passing between them at the time. In a letter from Mr. Stephens to James M. Turner, dated August 5, 1890, he says:

"If possible, I would like this letting of the construction contract to you wiped out of the organization, and the contract between us three to read just as we have

talked, viz.: Mr. Buhl and myself furnish the money, if necessary, up to $500,000. We each own one-third, for which you give us your notes from time to time, secured by your one-third of the stock and bonds. That's all there is to it, and I am ignorant of the necessity of dragging in and lumbering up an agreement with a contract to you for the construction of the road."

Mr. Turner, in his testimony, says:

"Mr. Buhl, Mr. Stephens, and myself are the company; but it was thought, as the contract ran to me, that I better not appear as a stockholder, in order to have it all legal."

We have seen that Mr. Davis held himself out as the agent of the company to various parties from whom goods were purchased, and to men whom he employed for the company, and that the affairs of the company were largely conducted by him, or under his direction, from the spring of 1891 forward.

James M. Turner was the active party for Buhl, Stephens, and Turner. The whole affairs of the company were in their hands. Mr. Turner, while so acting, gave direction to Davis. Mr. Turner says:

"I was to look after the building of the road up here, and employ the men to see to it. After Mr. Davis came up here, I gave him most of his orders direct from my office as between us three."

He says further:

"Davis' duties were to see that our men and teams were fed, and it was impossible to feed men and horses unless somebody became responsible for it."

He also says that he said to C. M. Turner, if he would make the arrangement with Davis, and turn in the bills at the end of each month, so as to be checked up and charged to the various persons, that the company would pay for all the supplies that he would furnish. James M. Turner also testified that when the June estimates were

presented Mr. Buhl, Mr. Stephens, Dingman, and himself
met in Detroit, and looked them over; that Dingman knew
but little about them.   Milo Davis was there, and wanted
about $50,000, aside from the pay rolls, for mercantile
accounts and accounts at two banks.     The accounts were
all looked over and scaled down as much as possible, but some
were to be paid by the company that month, and were paid.
Johnston, a witness for plaintiff, testified that Mr. Buhl
on one occasion told him in Detroit that " Milo Davis is
our agent up there."     This testimony, and the claims of
plaintiff, are contradicted by Mr. Buhl, Mr. Stephens, and
others; but the testimony and claims of the plaintiff were
proper for the consideration of the jury in determining
the question raised.

The court, upon this testimony, and the claims made by
the plaintiff, directed the jury substantially that if they
found that Davis was the agent of the defendant company,
with power to pledge the credit of the company to pay for
goods of the kind in question furnished along the line of
the road, and that he did in behalf of the company ver-
bally agree that the company would pay for them, and
plaintiff furnished the goods in conformity with the agree-
ment, relying upon that agreement, and looking solely to
the defendant for the price, and not to Mr. Dingman,
they should find for the plaintiff for the value of the
goods furnished before the time the written guaranty was
made; but, if the plaintiff looked both to the company
and to Dingman for such goods, they must find for the
defendant, as, in order to recover, they must find that
plaintiff looked only to the company, and not to Dingman
at all.   As to the goods sold under the written guaranty,
the court instructed the jury that, if they found that
Davis was authorized to make the guaranty in behalf of
the company, it would bind the company, and, if they

found that Dingman failed to pay for the goods so furnished, the defendant would be liable for their value.

1. It is contended by defendant that the admission of testimony showing that Buhl and Stephens were the heavy subscribers to the stock of the company was error prejudicial to the rights of the defendant company, as its tendency was to impress the jury that Buhl and Stephens were the railroad company. It is true that the introduction in evidence of the contract between Buhl, Stephens, and Turner and the testimony in relation thereto may have had that tendency, and the jury may have been impressed with the idea that these parties were the company; but the evidence was competent for the purpose of showing the authority of Turner in the premises. Counsel for defendant very aptly state the questions here involved as follows:

"Had Turner, by virtue of his relations with Buhl and Stephens, or by virtue of any instructions from them, power to guarantee payment to the plaintiff for the supplies in question; or had he the power, by virtue of that relation or those instructions, to authorize Milo Davis to make such a guaranty; or had Milo Davis, because of the fact that he was chief engineer of the road, or because of any authority from the railroad company, power to make such a guaranty?"

The court below directed the jury that the fact of Davis being chief engineer did not of itself imply such authority, so that question is not involved here.

It is evident from the manner in which the whole business of the construction of the road was conducted that substantially Buhl, Stephens, and Turner were the company, and their acts are binding upon the company itself. The company cannot adopt the acts that are advantageous to it and reject those which are disadvantageous. It is true that there was no formal corporate action, except the

making of the contract for the construction; but by this contract Turner was to have all the stock and bonds of the company, and he made it in the interest of Buhl, Stephens, and himself, and with the understanding that the road, as soon as constructed, was to be sold out for the benefit of the three. Much greater power was vested in Turner than was found to be vested in Smith by the Smith Middlings Purifier Company in *Preston Nat. Bank v. Purifier Co.*, 84 Mich. 364, and there it was said:

" Conceding that the president must exercise his powers of management in subordination to the board, yet when, as in this case, the stockholders, being the owners, have seen fit to vest certain extraordinary powers of management in the president, and certain other powers in the treasurer and superintendent, and the directors, with full knowledge of this, elect a man to fill all those offices, and thereafter put no restraint upon his management, the board must be held to have consented to his exercising all the power reasonably included in the language by which it was conferred. * * * * * * * * * *
" What the owners consent to expressly or permissively they ought not to be allowed afterwards to deny."

It is substantially shown that all parties connected with this enterprise agreed that the whole business should be done by and through Buhl, Stephens, and Turner; and it was so done. No one else had any voice in it, or took any part in it. No one else seems to have put a dollar of money in to carry out the contracts. Buhl and Stephens furnished it all, except what Mr. Joy put in originally, and that appears to have been arranged for. Buhl and Stephens then empowered Turner to act for the three, and he did so act, and his acts must be held binding upon the defendant company. This is supported by abundant authority: *Eureka Iron & Steel Works v. Bresnahan*, 60 Mich. 332; *Preston Nat. Bank v. Purifier Co., supra; Bank of Middlebury v. Railroad Co.*, 30 Vt. 159; *Orr Water-Ditch Co. v. Reno Water Co.*, 19 Nev. 60; *Hull v.*

*Glover*, 126 Ill. 122; *People v. Sugar-Refining Co.*, 121 N. Y. 582. The first proposition, therefore, that was laid down in *Hirschmann v. Railroad Co.*, *supra*, finds support here. Turner knew that Davis had arranged for the goods with plaintiff, and ratified and confirmed the action of Davis.

2. It is contended, however, that Turner being president of the plaintiff company, and his powers being limited in the contract, which provides that "no indebtedness shall be incurred, and no expenditures made, without the full consent and co-operation of all the parties to this agreement," Turner's knowledge of this limitation was the knowledge of plaintiff, and therefore plaintiff is estopped from recovery. There can be no doubt that Turner could legally act both for the defendant company—for Buhl, Stephens, and himself—and at the same time for the plaintiff company. A party may act in the double relation of agent for both parties. *Adams Mining Co. v. Senter*, 26 Mich. 73; *Colwell v. Iron Co.*, 36 Id. 51; *Rolling-Stock Co. v. Railroad Co.*, 34 Ohio St. 450; *Mayor, etc., v. Inman*, 57 Ga. 370; *Alexander v. Williams*, 14 Mo. App. 27; *Bank v. Iron Co.*, 97 Mo. 38; *Kitchen v. Railway Co.*, 69 Id. 224; *Fitzsimmons v. Express Co.*, 40 Ga. 330. There is nothing appearing in the case to show that Mr. C. M. Turner, who was the general manager of the plaintiff company, did not act in the utmost good faith in making the sales of the goods; and it is apparent that the defendant company actually had the benefit of the goods so furnished. The plaintiff company had constructed several miles of the road for the defendant company, and James M. Turner acted for both parties. The plaintiff company had furnished ties and lumber, which had been paid for, and the defendant company had placed money due the plaintiff to the credit of James M. Turner for the plaintiff. Some other deals had taken place between the

plaintiff and the defendant, in which James M. Turner had acted for both parties, and no objection had been made by the defendant, or its officers, or by Buhl and Stephens, so far as this record shows. It also appears that the limitation upon Turner's power as to the contraction of indebtedness was not adhered to, and he was permitted to go on with the building of the road if Dingman failed to carry out his contract. It is not claimed that any undue advantage was taken by the plaintiff company by or through this agency, the claim being that no power was vested in James M. Turner or Davis to authorize the purchase of the goods or guarantee payment therefor. Mr. Turner testified that he was to look after the building of the road, and to employ men to see to it, but that, after Davis came up, he gave him orders; Mr. Buhl says that Turner had authority to see to the building of the road under the contract; and, in addition to this, there is some evidence that Buhl and Stephens held Mr. Davis out as the agent of the company.

3. It is contended that certain testimony given by plaintiff under defendant's objection was inadmissible, and error is assigned upon the ruling of the court. This testimony was to the effect that Davis made statements as to his agency, and directed supplies to be furnished by different parties, and in general appeared to have authority and control over the matters of the company, making contracts for work, and directing the work to be done, and paying for supplies. It was held in *Hirschmann v. Railroad Co., supra,* that plaintiff was entitled to show what powers had been assumed by Davis, and the extent to which he had been contracting in the name of the company; and we think the rule was there settled that this testimony was admissible.

4. It is claimed that the evidence does not show that C. M. Turner, as the superintendent of the plaintiff com-

pany, in selling the goods for which suit is brought, looked solely to the defendant for payment, but, on the other hand, that he charged the goods to Dingman, and that they were sold on the credit of Dingman, and the plaintiff had no idea of looking to defendant for its pay, except in case Dingman failed to pay the debt; and that therefore the claim sued upon is void under the statute of frauds. We think it appears from the testimony of C. M. Turner that he would not sell the goods on the strength of Dingman's credit, and he so stated to Davis before any goods were furnished. They were sold, according to Mr. Turner's statement, solely upon the faith of the promise made by Davis that the defendant company would pay for them. This question was fairly submitted to the jury, and they have found against defendant's contention upon the facts.

We think, under the facts of this case, the principle laid down in *Bice v. Building Co.*, 96 Mich. 24, plainly applicable. In that case the defendant company had the right, under its contract with Wilson & Moore, at any time when the contractors failed to prosecute the work with diligence, to provide materials itself, and deduct the cost from the money due on the contract. When the defendant found that the plaintiffs would furnish no more materials to Wilson & Moore, or upon their credit, it agreed to make the payment directly to the plaintiffs, and it was held that the case was not within the statute of frauds; citing *Nelson v. Boynton*, 3 Metc. 396. The Court further said:

" The object to be accomplished by the defendant company was the immediate acquisition of those materials to put into the building. The purpose was not to benefit Wilson & Moore, or to obtain any forbearance for them, but to benefit the defendant company."

So, in the present case, the purpose of this arrange-

ment was to get materials to carry on this work, because Dingman could not purchase goods. This was so, not only with regard to the plaintiff, but with others along the line of the road; and the goods were delivered to the railroad company's camps, and there used. It was to benefit the company, and not to benefit Dingman, or to obtain any forbearance for him.

This rule was recognized in *Calkins v. Chandler*, 36 Mich. 320, and it was there said:

"But where the third party is himself to receive the benefit for which his promise is exchanged, it is not usually material whether the original debtor remains liable or not."

This case was cited with approval in *Perkins v. Hershey*, 77 Mich. 504.

We think, therefore, the principles found to be established in *Hirschmann v. Railroad Co., supra,* have been fully established here, and under the findings of the jury the defendant is properly held liable, not only upon the verbal arrangement made by Davis with C. M. Turner for the plaintiff, but also upon the written guaranty of Davis.

Many other errors are assigned upon this record, but we do not think it profitable to discuss them. The main features of the case involve the statement of many facts. The theory of both parties was laid before the jury in a full and fair charge, and the jury have determined the issues in favor of the plaintiff.

Judgment must be affirmed.

The other Justices concurred.